[Crim. No. 10615.   Second Dist., Div. Three.   Apr. 22, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. BARBARA JEAN ELLIOTT, Defendant and Appellant.

Leonard Nasatir for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

FRAMPTON, J. pro tem.*—Defendant was charged, by information, filed by the District Attorney of Los Angeles County with the crime of pimping, a felony, in violation of section 266h, Penal Code, in counts I, III, V, and VII thereof, and with the crime of pandering, a felony, in counts II, IV, VI and VIII thereof. The cause went to trial before a jury and on October 19, 1964, the jury returned its verdict finding the defendant guilty as charged in counts I, II, III, IV, VI, and VIII of the information, and not guilty as to counts V and VII thereof. A motion for a new trial was denied and probation was denied. The defendant was sentenced to state

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

prison on each count, the sentences to run concurrently. The appeal is from the judgment.

The defendant asserts two grounds for reversal as follows: (1) The judgment as to counts I and III cannot stand because only a male person may be charged and convicted of the crime of pimping as defined in section 266h, Penal Code,[1] and (2) the trial court committed prejudicial and reversible error in failing and refusing to instruct the jury as to the defendant's right to remain silent.

The case of the prosecution rested entirely upon the testimony of the two victims who, it was shown, were prostitutes and who were known as such by the defendant and from whose earnings the defendant was charged with having derived support and maintenance, and a landlady who had rented an apartment to a person in the presence of the defendant, and where, according to the record, the defendant sent victims A and B for the purpose of engaging in and where the latter actually engaged in acts of prostitution. The defendant did not take the witness stand and testify and no witness was called in her behalf.

A summary of the evidence shows that victim A first met the defendant in Orange County during the month of June 1960. Victim A informed the defendant that she had no place to go whereupon the defendant told her that she could stay with the defendant in Los Angeles and keep house for the latter.

Pursuant to this invitation, the victim came to the residence of defendant in July 1960. This residence was occupied by the defendant, her husband, Speros Steve Sarras, and a man named Joe. The first two or three weeks of her stay at the defendant's residence passed without incident. However, during this time the defendant dyed the victim's hair and bought clothing for her. Subsequently, the defendant asked victim A if she would like to go out drinking and dining with a man for money. She informed victim A that the man would pay $50 and that this rendezvous would involve having sexual intercourse with the man. The defendant gave victim A specific directions as to the time and place of the meeting and instructed her as to how she should behave. Victim A went to the designated location, met the man and engaged in an act of sexual intercourse with him for which she received the sum of

---

[1]"Any male person who, knowing a female person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of her prostitution, . . . or who solicits or receives compensation for soliciting for her, is guilty of pimping, a felony, . . . ."

$50. Victim A had not, before this incident, engaged in acts of prostitution. Upon returning to the defendant's residence she gave the latter the entire sum of $50.

It appears from the record that the man told the defendant that he was not satisfied, whereupon the defendant told victim A that in order for men to continue to return as clients, they must be properly entertained. As a result of this complaint, the defendant and Sarras (her husband), took victim A to bed with them for the purpose of instructing the latter in the methods she should use in entertaining future customers. A sexual orgy ensued, the revolting details of which are not necessary to relate here, which culminated in an act of sexual intercourse between victim A and Sarras.

Victim A engaged in three acts of sexual intercourse with three different men at the residence of defendant for which she received a total of $110, all of which was given to and kept by the defendant. In August 1960 the defendant took victim A to another house of prostitution where the defendant introduced her to a woman occupant and asked if a girl was needed. The woman occupant replied that there would be an opening in about one week. About September 1, 1960, victim A began work, as a prostitute, at this house. Either the defendant or Sarras would drive victim A to this house three mornings a week and would pick her up in the evenings. While at this house of prostitution victim A engaged in about 35 acts of sexual intercourse a day with different men for money. When either the defendant or Sarras arrived to pick her up in the evening she would give her total receipts to the one or the other, depending upon which one called for her. She continued to work under this arrangement for approximately four weeks. When not working at the house of prostitution, above referred to, the defendant arranged ''call dates'' for victim A. These consisted of a rendezvous with men at various locations for the purpose of having sexual intercourse for money. All money was given to the defendant on the victim's return from the ''call date.''

In September 1960, the defendant gave victim A the sum of $120 with instructions to use it to rent a specifically designated apartment on Highland Avenue in Hollywood where victim A could work ''call dates'' when she was available and if not available then victim A's sister could use the apartment for a similar purpose. The apartment was rented and thereafter the defendant would send victim A there where she met men and engaged in sexual intercourse with them for money. Later she gave the money to the defendant. Thereafter the

defendant would make appointments for men to have sexual intercourse with Victim A either at a prearranged location or at the rented apartment. Victim A's estimate of the amount received by her from her illicit activities during this time was $1,000 per week, all of which she gave to the defendant.

During the month of September 1960, victim A introduced her sister (victim B), to the defendant. Victim B and the defendant talked about acts of prostitution and thereafter victim B moved into the residence of the defendant. The defendant instructed victim B prior to "her first date" on the proper procedure. The defendant demonstrated to victim B the "wash and disease discovery technique" by using a regular male customer as a "guinea pig." The three of them disrobed and went to bed together. The defendant then engaged in an act of sexual intercourse with the male customer while victim B watched. The defendant was paid $20 by the male customer. Later that day the defendant sent victim B to an apartment where the latter had sexual intercourse with a man for which she received $25. Victim B had acts of sexual intercourse with two different men at the residence of the defendant, for which she received a total of $45. She gave the money received from her illegal transactions to the defendant or to Sarras, the defendant's husband. The defendant arranged additional "dates" for victim B, explaining on each occasion where she would meet the man, who he was, and how much he would pay. Victim B continued in these activities for about two weeks during which time she engaged in approximately 100 acts of sexual intercourse with different men for which she received about $2,000, all of which she turned over to the defendant or to Sarras, the defendant's husband.

About September 24, 1960, victims A and B left the State of California. They returned to Los Angeles in 1962 and took up residence at the home of the father-in-law of victim A. The defendant came to the home of the father-in-law and there discussed with the victims the prospect of their returning to work for the defendant as prostitutes. Pursuant to this discussion the victims did return and thereafter the defendant sent victim A to an apartment located on Mariposa Street in Los Angeles where victim A, according to her instructions, would find another "working girl" and a maid in attendance. Victim A went to this apartment where she remained for three or four days during which time she engaged in sexual intercourse with different men for money. She gave half of her earnings received here to the maid in attendance and kept half of it for herself.

The defendant on August 22, 1962, with an unidentified person, rented an apartment on Wilton Place in Los Angeles. Thereafter, the landlady of this apartment observed a Negro maid to be on the premises every day. The defendant gave the address of this apartment to victims A and B and told them to go there for the purpose of engaging in acts of prostitution. Both victims engaged in acts of sexual intercourse for money with various men at this location and turned over the money received for their services to the Negro maid. The victims were arrested at the Wilton Place apartment.

The information charged the defendant solely and as a principal with the crimes of pimping and pandering and no reference is made therein to defendant's husband, Speros Steve Sarras. There is a reference, however, in the reporter's transcript to the trial, on May 21st, 22nd and 27th, 1963, of the case of *People of the State of California* v. *Speros Steve Sarras.*[2] At the trial of the case at bench, the defendant being solely charged, the district attorney propounded his questions to the witnesses in such manner as to focus the testimony principally on the activities of the defendant Elliott. Notwithstanding this, the testimony elicited unmistakably brought out the details of the sordid partnership which existed between the defendant Elliott and her husband, Sarras, formed and carried out for the purpose of conducting a house of prostitution and to derive their support and maintenance in full or in part from the earnings of the victims whom they engaged to participate in acts of sexual intercourse for money with men customers procured by the defendant and her husband.

The evidence in the record leaves no doubt as to the guilt of the defendant as an aider and abetter of her husband, Speros Steve Sarras, in the commission of the crimes charged against her in the information.[3]

The case was tried on the theory that the defendant aided

---

[2]The record in this court shows that the defendant Speros Steve Sarras was accused by information No. 266395 filed by the District Attorney of Los Angeles County on December 10, 1962, of pimping in two counts and pandering in two counts alleged to have been committed during the period from August through September 1960. These charges involved the same victims as are involved in the case at bench. Sarras was found guilty as charged, after trial by jury, and was sentenced to state prison. An appeal followed and is now pending. (Second Criminal 9463, Division Two.)

[3]"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (Pen. Code, § 31.)

and abetted a male person (her husband), in the commission of the crimes charged. This court has ordered up and examined the superior court file in the action (Cal. Rules of Court, rule 12), and such file discloses that the jury was instructed as follows: ''Any male person who, knowing a female person is a prostitute, lives or derives support or maintenance in whole or in part, from the earnings or proceeds of her prostitution, is guilty of pimping, a felony.

''The defendant is charged in Counts I, III, V and VII of the information with pimping.'' The jury was further instructed that ''Under 266h of the Penal Code the prosecution must prove that the accused:

''(1) is a male

''(2) that the female is a prostitute

''(3) that the prostitute made some earnings from her business

''(4) that the defendant derived his support in *whole* or part from such earnings

''(5) that defendant received the money given him knowing that such money was the proceeds from such earnings.

''You are instructed that if any of the five (5) elements just mentioned have not been proved beyond a reasonable doubt by the prosecution the defendant must be acquitted.'' The jury was also instructed on the subject of who are principals substantially in the language of section 31 of the Penal Code and was further instructed on what constitutes aiding and abetting in the commission of a crime in the language of CALJIC (rev. ed. 1958) No. 91E as follows: ' For one person to aid and abet another in the commission of a criminal offense means to knowingly and with criminal intent aid, promote, encourage or instigate by act or counsel, or by both act and counsel, the commission of such offense.''

It has been held that a female person who aids, assists and abets a male person in the commission of the crime of pimping is regarded as a principal and may be charged, tried and convicted as such. (*People* v. *Young,* 132 Cal.App. 770, 771 [23 P.2d 524] ; *People* v. *Severino,* 122 Cal.App.2d 172, 180 [264 P.2d 656] ; *People* v. *Courtney,* 176 Cal.App.2d 731, 740 [1 Cal.Rptr. 789].) A female person may be convicted as an aider and abettor of the crime of rape. (*People* v. *Bartol,* 24 Cal.App. 659 [142 P. 510] ; *People* v. *Smith,* 204 Cal.App.2d 797, 800 [23 Cal.Rptr. 5].) ▪ While in *Young* and *Courtney, supra,* the female person was charged with the crime of pimping jointly with the male person whom she aided and

abetted, section 971 of the Penal Code[4] authorizes the accusatory pleading against an aider and abettor to be drawn in the identical form as an accusatory pleading against the principal. It makes no distinction between them.

As heretofore pointed out, the defendant did not testify at the trial. The district attorney, in his argument to the jury, did not comment upon the defendant's failure to testify. The defendant requested the court, and the court refused, to instruct the jury on the subject of her failure to testify. The requested instructions were in the language of CALJIC (rev. ed. 1958) Nos. 51, 51-A and 51-B.[5]

█ These instructions, when read together, contain a statement of the law applicable in a criminal trial, as set forth in article I, section 13 of the California Constitution, as amended in 1934,[6] and section 1323 of the Penal Code.

---

[4] "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals and no other facts need be alleged in any accusatory pleading against any such person than are required in an accusatory pleading against a principal."

[5] "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. The failure of a defendant to deny or explain evidence against him does not, however, create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt." (No. 51.)

"In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain any certain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence." (No. 51-A.)

"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a finding against him on any such essential element." (No. 51-B.)

[6] "... No person shall ... be compelled, in any criminal case, to be a witness against himself; ... but in any criminal case, whether the defendant testifies or not, his failure to explain or deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury. ..."

These instructions, when given in a criminal action, constitute a judicial comment on the effect of the defendant's failure to testify. The giving of them is tantamount to the imposition of a penalty upon a defendant for his exercise of a constitutional privilege. ''What the jury may infer given no help from the court is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another.'' (*Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106, 110].) It would have been error for the trial court to have given the requested instructions.

The 'defendant urges that the court should have, of its own motion, instructed the jury on the right of the defendant to remain silent and that the court's failure in this respect constituted reversible error. In a case in which the defendant had requested the trial court to instruct the jury concerning his right to remain silent, it was held to be reversible error to refuse such request in view of an applicable federal statute. (*Bruno* v. *United States* (1939) 308 U.S. 287 [60 S.Ct. 198, 84 L.Ed. 257].) No statute of that nature is involved in the case at bench. Where the defendant was charged with murder and armed robbery, and elected not to take the witness stand and testify in his own behalf on the issue of guilt, and the district attorney commented thereon and the court instructed the jury regarding the legal effect of such failure to testify, within the purview of article I, section 13 of the California Constitution, it was held that the comment and the instruction constituted error, but was not reversible error unless it resulted in a miscarriage of justice within the purview of section 4½ of article VI of the California Constitution. (*People* v. *Bostick,* 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Teale,* 63 Cal.2d 178, 195 et seq. [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Anderson,* 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Cotter,* 63 Cal.2d 386, 398 [46 Cal. Rptr. 622, 405 P.2d 862].)

If comment by the prosecutor and instructions by the trial court, which characterize the failure of the defendant to testify in his behalf upon the issue of guilt, as carrying an inference of guilt, do not require a reversal unless it can be said that such error has resulted in a miscarriage of justice then the failure of the trial court, of its own motion, to give an appropriate instruction directing the jury to draw no unfavorable inferences against the defendant for his not having taken the witness stand, may not be held to require a reversal of the

judgment, unless it can be said that such failure has resulted in a miscarriage of justice.

We have examined the entire cause, including the evidence, and if it can be said that the failure of the court to instruct the jury, of its own motion, concerning the right of the defendant to remain silent, constituted error, such error in view of the overwhelming evidence of guilt, did not result in a miscarriage of justice. (Art. VI, § 4½, Cal. Const.)

The judgment is affirmed.

Ford, J., and Kaus, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 17, 1966.