[Crim. No. 334.   Fifth Dist.   June 1, 1967.]

THE   PEOPLE,   Plaintiff and Respondent,   v.   CALVIN GEORGE GRAHAM, JR., et al., Defendants and Appellants.

Daniel J. Sullivan, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, P. J.—Three persons, Calvin George Graham, Jr., Charles Pike, and James Edward Casey, were charged with grand theft by reason of the "till-tapping" on December 7, 1965, of the Z Market in Truckee, whereby $460 was stolen, in the form of 23 twenty-dollar bills. Charles Pike, who inserted his hand in the cash register, removed the bills and ran away, changed his original plea to admit guilt. This left the appellants, Calvin George Graham and James Edward Casey, for trial by the jury; each of them was found guilty as charged.

Appellant Casey, specifically, and appellant Graham, by inference, claimed that they were found guilty solely by reason of association with Pike; on the contrary, the People argue that the appellants were guilty, not by association, but by participation, and that the judgment against them must be affirmed.

The office manager of the Z Market in Truckee, Mr. Oliver Crose, testified that on December 7, 1965, he took care of the store for approximately an hour and a half during the head checker's lunch hour, and that, when the three men came into the market, he was near the meat shop but came to the checkout stand. Two of the men approached the east stand, where Casey requested a package of Pall Mall cigarettes. Mr. Crose removed a pack of Pall Malls, which was above the register, laid it on the counter next to Mr. Casey and rang the price up on the till; the drawer opened and Mr. Casey gave Mr. Crose a dollar bill; Crose started to make change and immediately Graham, who was behind Mr. Crose, requested Life Savers; Crose then closed the cash register and turned around to discuss the request with Graham, who finally decided he did not want any; but he first asked Crose what brands and what flavors he had; then, Crose took the dollar, opened the cash register and started for the second time to make change; then Casey asked how much he had said the cigarettes were, and Crose told him 28 cents; Casey said to give back the one dollar bill, because he had the correct change; this was done, and Crose put the change in the register and closed the till; the three men left the store. Mr. Pike had entered the market with the two defendants, and while Mr. Crose did not see him during the negotiations, he saw him leave with the other two men.

Ten minutes later the three men returned to the market and two of them went toward the meat shop. The third walked to the other end of the store; as there was no other person in the sales area, Mr. Crose went to the meat counter to help the two men. One of them requested bulk salami, which the store did not have; they were told that the market had packaged salami and were shown where it was kept; they asked if a roll of braunschweiger could be cut up for them, and the store manager answered that they did not cut up braunschweiger; the two men then took a small package of lunch meat and went toward the other end of the market, one of them saying, ". . . . we'll get some crackers to go with it." Mr. Crose walked to the check stand, and Casey came up with the package of lunch meat and laid it on the counter; he said that would be all he wanted; Mr. Crose rang the amount of the purchase on the register, which opened the cash drawer; Casey then started to reach down behind the counter where some candy was hanging, and asked if Mr. Crose would help him get some candy; Crose closed the cash register and started to go around the check stand to help him select what was wanted, and then Casey said—no, that he didn't want any candy, and he handed a dollar bill to pay for the meat; Mr. Crose opened the cash register again and then Casey "immediately wanted some more candy"; Mr. Crose took the change out of the cash register, closed the drawer, laid the change down, put the meat on the counter, and then followed him around and started to help him pick out the candy. At this time, the store butcher, who had been in the back room, came into the market with a delivery man; one of the three customers had gone down an aisle near a drug rack; he "hollered," asking if the store had a certain kind of shaving lotion; so, Mr. Crose and the other two customers went to that aisle to find the shaving lotion; when the lotion could not be found, the three customers left the store. Mr. Crose did not see them again until later that day.

Howard Glenn Lewis, Jr., the head checker at the Z Market, testified that during the late afternoon of December 7, 1965, he ran out of twenty-dollar bills and got additional bills from the combination safe by the front door. Lewis unlocked it and took out 25 twenty-dollar bills, or a total of $500, and put the bills in the cash drawer. After that, he had one customer who paid for her groceries by check, and then the next customers were Graham and Casey; they entered the store together; Graham asked for a pack of Pall Mall cigarettes, and Mr.

Lewis, who was standing next to him, got the cigarettes and put them on the counter. Graham handed Lewis a dollar bill for the cigarettes and Mr. Lewis rang up 28 cents, which opened the drawer. Lewis started to put the dollar in, but Graham said, "Wait a minute," and requested again to know the cost of the cigarettes. When Lewis said, "28 cents" Graham said, ". . . give me the dollar back," because he had the correct change. This was done, and as Mr. Graham handed the 28 cents in coin to Mr. Lewis and the latter started to close the drawer, Graham said, ". . . wait a minute, I need some Life Savers"; they were on the other side of the cash register, and Lewis had to turn his body completely around to look at the Life Savers; the drawer to the cash register was left open. Graham was saying something which Lewis could not understand. Mr. Lewis turned around; Pike, on the other side of the register, had stretched around the machine, and had his hand amongst the twenty-dollar bills. Mr. Lewis saw Pike's hand in the drawer, and that he pulled out his fist with a big wad of twenty-dollar bills in his grasp; Mr. Lewis closed the drawer, yelled for his boss, buzzed the bookkeeper, and ran out the door after Pike. The thief left very quickly. Casey and Graham, in the same aisle, stood there as Pike and Mr. Lewis ran out; then, they also left; Pike, as he was running out of the store, had his coat on; his hand was in his pocket; he ran out the door to the parking area where his car was; he hurriedly got in it, backed out the car, and temporarily escaped. By that time it had grown dark; Lewis thought the car was a '54 Chevrolet; he remembered the license number and told the bookkeeper.

A woman customer was standing at the check stand to be waited on when David Rose, one of the owners of the store, responded to the buzzer. When he got to the front of the market, there were no employees in sight. The customer wanted a few items and she paid for them, and the owner opened the till; Mr. Rose noticed that only two twenty-dollar bills were left in the cash register, and remembered that not more than five minutes before, he had been out front and $500 in twenties had been taken out of the safe by an employee to be put in the cash register; Rose was surprised at the shortage of twenty-dollar bills, and thought that two or three large checks must have been cashed. As the owner was waiting on the customer, Lewis returned to the store. The owner then checked out the register with Mr. Crose. The cash register was short by $460 (i.e. 23 twenty-dollar bills) and some cents from what the total amount should have been.

Sergeant Sam Doyle of the Sierra County sheriff's office testified that on the night of December 7, 1965, he received a dispatch from his office, relaying a message that there had been a "till-tap" in Truckee; that about $460 in twenty-dollar bills had been stolen; and that the three Negro suspects believed to have been involved had left driving a 1954 brown Chevrolet. This message was received at 6:30 p.m. The car supposedly had an Idaho license; as the officer was en route to Sierraville to help the highway patrolman there set up a road block, he noticed a car of the same general description going in the opposite direction; the officer turned around and caught up to the car to check the license plate. The vehicle was from Iowa, but the number of the license was the same as described by radio. The car "pulled over and stopped." It was a 1952 model Ford, brown in color. The officer told the three men in the automobile to get out of the car, and he called the highway patrolman in Sierraville to assist him. When the second officer arrived, a preliminary search for weapons was made and the men were put in the patrol car and taken to Loyalton, where they were jailed. Eighty dollars —four twenty-dollar bills and some change—were found on Mr. Casey; Graham had $132, including six twenty-dollar bills, and some change; Pike had $263, thirteen twenty-dollar bills, plus the odd amount.

Appellant Graham did not take the stand. Appellant Casey testified that he and Graham went into the store, but he did not see Pike come into the market and did not expect him to come in; neither did he see Pike put his hand in the cash register, and he stated that he himself did not take anything from the cash register—nor did Graham. Casey testified that he did not run out of the store; that he did see Pike leave followed by Lewis. Casey testified that Graham did not run out of the store. He swore that he did not know what happened at the scene of the alleged theft. He said that he and Graham walked out, went to their car, and that he himself got behind the wheel.

It is clear that the three men were acting in concert and that they entered the store three times and indulged, on each occasion, in an unusual pattern of conduct conclusively aimed at securing access to the cash register while the checker's attention was diverted so that he would not see the actual asportation of the money. This device of concerted action by thieves in a busy store to create an opportunity for one of them to steal money from the cash register is unfortunately a

relatively common experience in recent times. In the opinion in *People* v. *Clay,* 227 Cal.App.2d 87, 100 [38 Cal.Rptr. 431, 100 A.L.R.2d 1421], Mr. Justice Sullivan considers in detail expert evidence showing these tactics of store thieves. (See also *People* v. *Moore,* 234 Cal.App.2d 29, 30 [44 Cal.Rptr. 184] ; *People* v. *Lodge,* 212 Cal.App.2d 410, 412 [28 Cal.Rptr. 5] ; *People* v. *Stone,* 155 Cal.App.2d 259 [318 P.2d 25] ; *People* v. *Owens,* 98 Cal.App.2d 485 [220 P.2d 575] ; *People* v. *Jollet,* 60 Cal.App.2d 245 [140 P.2d 479] ; *People* v. *Wright,* 199 Cal.App.2d 30 [18 Cal.Rptr. 243].)

In *People* v. *Lodge, supra,* 212 Cal.App.2d 410, 413, the court said, quoting from another case, defendant " ' . . . may have committed no overt act during the robbery but none was required. His presence could have given encouragement to his companion. . . .' " Both Casey and Graham, by their unusual and repetitious conduct aimed at securing an unprotected open till, participated directly in the scheme for theft. The concerted action among Graham, Pike, and Casey was legitimately proved by ample circumstantial evidence ; the record justifies a reasonable inference that the intent to steal existed from the start and the verdict cannot be disturbed. It should be noted that after Pike ran out of the market door, the two appellants took to their heels outside the store and ran in different directions. Also a summary of the proof showed that exactly 23 twenty-dollar bills were found upon the defendants after the arrest, and that each of them had some of the bills.

The verdict and judgment of conviction were entirely justified.

The only other point raised by either appellant on appeal is characterized by the following subheading in their brief :

"Appellant Graham was denied a fair trial by reason of the court's prejudicial misconduct in failing, *sua sponte,* to give the jury instructions on not drawing an inference of guilt from defendant Graham's election not to testify. "

We are not prepared to hold that a failure to give such an instruction in the absence of a request to do so constitutes an inevitable error. It may well be that many defendants who have not testified in their own defense may prefer not to have such a pointed reference to the fact made by the trial court in its instructions.

But if the failure to give such an instruction, *sua sponte,* is in fact an error, it would not follow that such an error would be automatically prejudicial.

As previously indicated, we believe that the evidence, though indirect, established the guilt of the appellants without question. We do not believe if such an instruction had been given by the court, *sua sponte,* that there would have been ". . . a reasonable possibility" that the jury would or could have reached any other decision than it did.

The appellants were obviously convicted because of their activities in relation to Pike's theft and not because Graham did not take the witness stand. An instruction as now requested by him would have added nothing to his defense. We, therefore, believe that this question is resolved by the ruling made in *People* v. *Elliott,* 241 Cal.App.2d 659 [50 Cal.Rptr. 757], in which a hearing was denied by the California Supreme Court and certiorari refused by the United States Supreme Court. (385 U.S. 941 [17 L.Ed.2d 221, 87 S.Ct. 312].) That case is to the effect that the failure to give such an instruction, *sua sponte,* is not reversible error in a situation where proof of guilt was as strong as it was there. Here, as in the *Elliott* case, there was no miscarriage of justice.

In the *Elliott* opinion, the court discusses the *Griffin* rule (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) and the *Bruno* case (*Bruno* v. *United States,* 308 U.S. 287 [84 L.Ed. 257, 60 S.Ct. 198]) and considers the holding set out in *People* v. *Bostick,* 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529]; in the latter case, the defendant was charged with murder and armed robbery but did not take the witness stand to testify in his own behalf on the issue of guilt; the district attorney made adverse comment, and the court instructed on the effect of the failure to testify, as provided in article I, section 13 of the California Constitution; the *Bostick* case held that the comment and the instruction constituted error, but that it was not reversible error unless it resulted in a miscarriage of justice within the purview of section 4½ of article VI of the California Constitution.* The *Elliott* opinion at pages 667-668 stated: ''If comment by the prosecutor and instructions by the trial court, which characterize the failure of the defendant to testify in his behalf upon the issue of guilt, as carrying an inference of guilt, do not require a reversal unless it can be said that such error has resulted in a miscarriage of justice then the failure of the trial court, of its own motion, to give an appropriate instruction directing the jury to draw no unfavorable inferences

*Now article VI, section 13, amendment adopted November 8, 1966.

against the defendant for his not having taken the witness stand, may not be held to require a reversal of the judgment, unless it can be said that such failure has resulted in a miscarriage of justice.''

The last paragraph of the *Elliott* opinion (p. 668), we believe, is applicable to this case where the court said: ''We have examined the entire cause, including the evidence, and if it can be said that the failure of the court to instruct the jury, of its own motion, concerning the right of the defendant to remain silent, constituted error, such error in view of the overwhelming evidence of guilt, did not result in a miscarriage of justice. (Art. VI, § 4½, Cal. Const.)''

The judgments of conviction are affirmed.

Stone, J., and Gargano, J., concurred.