[Crim. No. 12034. In Bank. Aug. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES GARDNER, Defendant and Appellant.

844

Richard Gladstein, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—A jury found defendant guilty of first degree murder and fixed the penalty at death. Motions for a new trial and reduction of penalty were denied, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

We have now concluded that the judgment as to guilt should be affirmed but that under the compulsion of *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the death penalty must be set aside and defendant remanded to the trial court for a new trial limited to the issue of penalty.

Gerald Bispo left his home in Oakland about 7:45 a.m., July 31, 1967, carrying a brief case containing a key case and a wallet containing about $20. He was seen entering his clothing store located on 23d Avenue near East 14th about 8:10

a.m. He was later seen sweeping the front sidewalk about 8:30 a.m. Two men, Henry Desynek and Ray Miller, were sitting in a car about 50 feet back from the store at the time. Desynek testified that he saw two persons leave the store "carrying a paper bag like, you know, like when clothing or something on that order." The only description he could give was that they were both Negro and appeared to be in their early 20's. About ten minutes later Desynek saw a mailman enter the store and, shortly thereafter, the police arrived. The mailman testified that he entered the store about 9:10 a.m., that he did not see anyone in the store, that he heard someone groaning behind the counter, and that he found Bispo lying on the floor in a pool of blood. He noticed glass and a paper bag on the floor. He called the police.

Officer Burns found Bispo trying to get up but unable to talk. He had the ambulance attendants immediately take him to the hospital. He noticed a large pool of blood on the floor, some shattered glass, a small brown sack in a torn condition, and a broken Pepsi-Cola bottle. The cash register was open, with only a few pennies in the drawer. Officer Sims collected the pieces of glass, which he said were scattered over an area about ten feet in length. He used a pair of forceps to pick up the glass and the paper bag and to place them in a shoe box. Mrs. Bispo testified that her husband did not have Pepsi-Cola in his lunch and that none of the debris on the floor had been there when the store closed on Saturday night. She testified that it was her husband's custom to keep $150 in the money box and upon his arrival at the store to place half of it in the cash register and the remaining $75 in a compartment in the safe. The money in the safe was found intact. The victim's wallet, brief case and key case were never found.

That evening Bispo died. The autopsy surgeon testified that death was due to multiple blunt injuries of the head, with cardiac arrest. He gave as his opinion that the injuries received were consistent with having been caused by blows from a Pepsi-Cola bottle. The bottle appeared to have been inside the paper bag at the time it was used as a lethal weapon. The victim sustained a fractured skull and nose and from the appearance of the hands and eyes he had apparently tried to protect his eyes with his hands during a brutal attack.

Davis, director of the police criminalistics laboratory, and his assistant Tellesbo, a fingerprint expert, visited the store the day after the crime. Tellesbo lifted six latent fingerprints and later tested these and some 15 prints which had been

lifted by the police. No identification was ever made of the prints lifted from surfaces inside the store. Davis observed widespread splatters of blood and broken glass. He picked up more glass and other items, including a loose button, for examination.

Fingerprints were found by Davis on the paper bag. Davis identified one of the prints on the bag as that of the defendant, by comparison with prints taken from the police master file. At the request of Inspector Roehl, defendant went to the police station for an interview. He was questioned as to his whereabouts on July 31st but without specific reference to the murder. He stated that he was out late the night before, that his mother was home when he came in, and that he did not go out again until 4 or 5 p.m. that afternoon. Roehl wrote down the statements and defendant signed them. He was refingerprinted. On the basis of the similarity of a print on the bag with his, defendant was subsequently arrested. A search was made of his home and numerous articles of clothing were taken. These were given to Davis for inspection. The button was not traced to any of his clothes. The only item introduced in evidence at the trial was a pair of shoes in which glass was found imbedded in the soles of each shoe. Three particles in one shoe were found by Davis to match particles of glass found in Bispo's store. None of the victim's belongings were traced to defendant.

Defendant did not testify at the guilt trial. His mother testified that defendant was at home when she got in on the morning of July 31st, about 6:30 or 7:30; that he left home between 8:30 and 9 a.m.; and that she next saw him about 5 p.m. near Foothill and 23d. George Gardner (no relation) testified that he picked up defendant and another person at Foothill and Fairfax about 9:30 or 10 a.m. and left them at Foothill and 23d. No evidence was given as to the distances between these locations.

Also called as witnesses for the defense were inspector Roehl and Officer Garrison. Roehl testified that he had arrested one Houston Cartright for the murder of Bispo but had released him for insufficient evidence. Other suspects had been released. Garrison testified that in a conversation with Houston's mother she had told him that her son had admitted being involved in a scuffle with Bispo in his store and that he and another boy had gone to her house seeking refuge from the police. She appeared to be under the influence of alcohol

at the time. She did not identify the other boy. She did not testify at the trial.

It was stipulated that evidence received at the guilt trial might be considered by the jury at the penalty trial, and both sides introduced additional evidence.

1. THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTION

 The paper sack which covered the bottle used as the lethal weapon had two of defendant's fingerprints on it; one of his shoes had glass fragments which were found to correspond with glass found at the scene of the crime; he was within the age and racial description given by an eyewitness; he gave false statements to the police as to his whereabouts and activities on that date. The evidence, while circumstantial, was sufficient to convict.

(a) *The fingerprint evidence.*

Davis' qualifications as an expert were conceded by both counsel and are not attacked on this appeal. He testified that he utilized a chemical process to develop the fingerprints on the paper sack and that he photographed and rephotographed them for study and comparison. In his opinion there were at least 16 comparable characteristics between the bag fingerprints shown on People's exhibit 14[1] and defendant's left middle fingerprint, and 19 with those on People's exhibit 13[2] and defendant's right thumb print. He stated that it was his opinion that these two prints on the bag were defendant's. He further testified that different departments have different requirements as to the number of points of similarity required to make a positive identification; that the Federal Bureau of

---

[1] ". . . I think it is 16 or 17 different positions at which I felt there were comparable characteristics. These are visible on close examination and on comparison with the original, with the inked print. Some of these are fairly clear and some of them are not. I think there are perhaps 8 or 10 that are quite clear and if you study it, you can see them. Others are not so clear but with experience, they may appear to be.

"Q. I see, and it appears that these pinholes are in a similar pattern on both photographs?

"A. Yes, that is true, and that would illustrate the fact that the points are in the same general orientation to the two prints.

"Q. And each hole represents at least in your opinion, a point of similarity as far as the characteristics are concerned, is that correct?

"A. Yes.

[2] ". . . I have actually marked up 19 different characteristics here, and a few of these may not be so clear as others, but there are well over 12 characteristics that are quite clear and distinct, and again I have punched them with needle points and they can be compared and located."

Identification requires 12; and that the Oakland Police Department prefers 10 to 12. On cross-examination he stated that there was blood but no bloody prints on the bag, that the prints found were from the oil on the skin, and that they could have been on the bag before it was used with the bottle in the crime.

Appellate counsel for defendant argues that this is weak and insufficient evidence; that there are inconsistencies in the testimony of Davis at the trial;[3] that there are discrepancies between the testimony of Tellesbo at the preliminary hearing and the testimony of Davis at the trial, and between the laboratory reports of Davis and the testimony of Davis at the trial. Neither the transcript of the preliminary hearing nor the laboratory reports were introduced in evidence at the trial and they are not of record on this appeal. ■ Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs. (*People* v. *Merriam,* 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161].)

■ Fingerprint evidence is the strongest evidence of identity, and is ordinarily sufficient alone to identify the defendant. (*People* v. *Riser,* 47 Cal.2d 566, 589 [305 P.2d 1] [app. dismd. 358 U.S. 646 [3 L.Ed.2d 568, 79 S.Ct. 537]]; Witkin, Cal. Evidence (2d ed. 1966) Circumstantial Evidence, § 370.) ■ The jury is entitled to draw its own inferences as to how the defendant's prints came to be on the bag and when (see *People* v. *Wise,* 199 Cal.App.2d 57, 59-60 [18 Cal.Rptr. 343]) and to weigh the evidence and opinion of the fingerprint experts.

(b) *The glass particles in the defendant's left shoe.*

The evidence showed that there were glass fragments and a broken Pepsi-Cola bottle on the floor near the victim. The floor had a hard surface and Davis testified that a person walking

---

[3]Cross-examination of Davis: ''Q. As an expert, what do you consider the number [of characteristics] that would be necessary for testimony in Court?

''A. . . . I generally tend to have 10 or 12 characteristics and if they are not clear and distinct, I would have more, and we have more here. . . .

''Q. What would you give as the number of clear points of identification or comparison that you found on . . . Exhibit 14?

''A. Exhibit 14? Well, as I say, there are between 8 and 12, and I think we could sit here all day deciding whether I consider one clear and the next one not quite so clear. I think if we say, and I will, someplace between 8 and 12, and what might be clear to me might not be clear to you, or something might even be clear today and not quite so clear tomorrow. You have to study these sometimes in order to make the comparison.''

over glass could pick up glass in his shoes. In examining this pair of shoes he found that there were glass particles in the soles of each. He removed seven from the left and three from the right. After testing he discarded all of these except three from the left shoe. With such small particles of glass he found there were only two feasible tests and he used them both. One is a density comparison, comparing the density of the glass against the density of the suspected source or known sample; the other is the comparison of the refractive index of the glass. If these two properties are the same there is, in his opinion, very good evidence that the two glasses are of the same composition and could have been from the same source.

 He found that the three particles he removed from the left shoe matched the particles of glass he had picked up from the floor at Bispo's in density and refractive index comparison.

Davis further testified that he found no traces of blood on any of defendant's clothing which was presented to him for examination. This would include the shoes in question. It would be for the jury to weigh the inference to be drawn from the evidence.

(c) *The testimony of Desynek and defendant's false statement to Roehl.*

Desynek did not purport to identify defendant, but he did describe the persons he saw leaving the store just prior to the discovery of the victim as being in their early 20's and being Negro. Defendant was 19 and a Negro. His false statement as to his whereabouts at that time and place was before the jury at the guilt phase.

The court instructed the jury that the case was entirely upon circumstantial evidence. On the motion for new trial hearing the court stated, ". . . the Court's independent appraisal of the evidence determines that the guilt of the defendant of murder in the first degree has been established beyond a reasonable doubt. . . ."

 In reviewing the sufficiency of the evidence an appellate court "must assume in favor of the verdict the existence of every fact that the [trier of fact] could reasonably deduce from the evidence and then determine whether or not a reasonable [trier of fact] could find the defendant guilty beyond a reasonable doubt." (*People* v. *Huizenga,* 34 Cal.2d 669, 676 [213 P.2d 710].) Here the evidence had probative value, it convinced the minds and consciences of those charged with pass-

ing upon the facts, and it may not be reweighed by an appellate court.

## 2. WHETHER DEFENDANT WAS DEPRIVED OF EFFECTIVE LEGAL REPRESENTATION

Again counsel on appeal refers to matters outside the record (preliminary hearing transcript, laboratory reports, police reports). He complains that the public defender failed to use, or use adequately, information which he knew existed (the laboratory reports and transcript) or which he should have known existed (current books on fingerprint and glass identification, or requesting the court to appoint an expert to assist the defense) in cross-examining Davis at the trial and in challenging the basic assumptions on which Davis premised his opinions; that he raised no question as to the age of the fingerprints on the bag; failed to question Davis as to inconsistencies in his testimony at the trial; asked no questions at all regarding the glass particles on cross-examination; refused to accept the court's invitation, made at the outset of Davis' testimony, to look at the laboratory report Davis was about to use and, thereby, failed to discover and therefore to use new information about the glass tests; made little or no cross-examination of prosecution witnesses; failed to accept the court's suggestion that it would allow him to recall Davis to the stand to question him about the alleged inconsistencies; failed to use information learned at the preliminary hearing to discredit Dysenek's observations; and that he objected to an instruction proposed by the court[4] which the court then withdrew.

It is not possible to say that the public defender's strategy or trial tactics reduced the trial to a "farce or a sham" or demonstrated that he was "incompetent" to conduct the defense. ■ Problems of strategy are the responsibility of defense counsel and an extreme case must be disclosed to justify relief on the ground of constitutionally inadequate representation by counsel. (*People v. Reeves*, 64 Cal.2d 766, 774-775 [51 Cal.Rptr. 691, 415 P.2d 35].) ■ Our adversary system is "built upon the belief that truth will best be served if defense counsel is given the maximum possible leeway" to

[4]CALJIC 51 (re-revised) reads: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. You must not draw any inference of guilt from the fact that he does not testify, nor should this fact be discussed by you or enter into your deliberations in any way."

present his client's defense. (*Smith* v. *Superior Court,* 68 Cal.2d 547, 560 [68 Cal.Rptr. 1, 440 P.2d 65].) Comparisons as made by present counsel between the amount of time counsel spent before the jury and the time spent by him presenting legal issues in chambers does not indicate incompetent or inadequate representation either on the time issue or on the content of his defense. It cannot be said that his determination to make limited use of cross-examination was not within a permissible area of strategy. The wisdom or success thereof is not in issue. No objection was made by defendant during the trial and in every instance in which he was directly questioned by the court he concurred in the actions of his attorney.

3. WHETHER THERE WAS PREJUDICIAL ERROR IN THE TRIAL COURT'S CONDUCT OF THE TRIAL

█ Defendant contends that at the guilt trial the court erred in admitting, over objection, colored slides of the victim's wounds. The slides were gruesome to view but the court determined that their probative value outweighed any prejudicial effect they might have. They were admitted in support of the autopsy surgeon's explanation of the wounds found on the victim and the possible cause, namely—by severe blows to the head and face and hands and that such injuries could have been made by the sack-wrapped bottle found on the scene. The court did not abuse its discretion in admitting the slides.

█ Defendant contends that the court erred in failing to give CALJIC 51 (re-revised) which concerns a defendant's right not to be compelled to testify and forbids the drawing of an inference of guilt from the fact that he does not testify.[5] Defendant did not request the instruction and to the contrary specifically requested that it not be given.

The United States Supreme Court has expressly reserved decision "on whether an accused can require, as in *Bruno* v. *United States,* 308 U.S. 287 [84 L.Ed. 257, 60 S.Ct 198], that the jury be instructed that his silence must be disregarded." (See *Griffin* v. *California* (1965) 380 U.S. 609, 615, fn. 6 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229].) Even if it be assumed that a defendant may require the giving of such an instruction, the court, as we shall see, has no duty to give the instruction on its own motion.

█ In criminal cases, even when not requested, the court

[5]See footnote 4 herein.

must instruct on the general principles of law relevant to the issues raised by the evidence. (*People* v. *Jackson,* 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937].; *People* v. *Warren,* 16 Cal.2d 103, 116-117 [104 P.2d 1024]; *People* v. *Scofield,* 203 Cal. 703, 709 [265 P. 914]; *People* v. *Peck,* 43 Cal.App. 638, 649 [185 P. 881].) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People* v. *Wade,* 53 Cal.2d 322, 334 . . . ; see Witkin, Cal. Criminal Procedure (1963) § 472, p. 478, and authorities cited therein.)" (*People* v. *Wilson,* 66 Cal.2d 749, 759 [59 Cal. Rptr. 156, 427 P.2d 820].)

That an instruction such as the one in question is not necessary for the jury's understanding of the case is implicit in several decisions. Before the 1934 amendment to our state Constitution authorizing comment on a defendant's failure to testify, which amendment was held invalid in *Griffin* v. *California, supra,* 380 U.S. 609, such comment was violative of the defendant's privilege against self-incrimination (see *People* v. *Bostick,* 62 Cal.2d 820, 825 [44 Cal.Rptr. 649, 402 P.2d 529]), and during that period it was the rule that the defendant could not complain of the failure to instruct that no adverse inference could be drawn from his failure to testify if no request was made for such an instruction (*People* v. *Rogers,* 163 Cal. 476, 484-485 [126 P. 143]; *People* v. *Flynn,* 73 Cal. 511, 513-514 [15 P. 102]; *People* v. *Mitsunaga,* 91 Cal.App. 298, 303 [266 P. 1020].)

Recently the question whether the court has a duty to give on its own motion an instruction such as the one in question has been presented in three cases. Two of them did not decide the matter but held that any error in the failure to give the instruction was not prejudicial. (*People* v. *Graham* (1967) 251 Cal.App.2d 513, 518-519 [59 Cal.Rptr. 577]; *People* v. *Elliott* (1966) 241 Cal.App.2d 659, 669 [50 Cal.Rptr. 757] [cert. den. 385 U.S. 941 [17 L.Ed.2d 221, 87 S.Ct. 312]].) The third case held that the court is under no duty to give the instruction on its own motion. (*People* v. *Horrigan* (1967) 253 Cal.App.2d 519, 521-523 [61 Cal.Rptr. 403].)[6] *Horrigan* reasoned that the instruction contains many of the vices con-

---

[6] *People* v. *Horrigan, supra,* 253 Cal.App.2d 519, 522, also contains dictum that it is error for the court to give the instruction on its own motion, and *People* v. *Molano,* 253 Cal.App.2d 841, 846-847 [61 Cal.Rptr. 821, 18 A.L.R.3d 1328], similarly held that the giving of the instruction over the defendant's objection is error. However, in *People* v. *Brown,*

demned in *Griffin* v. *California, supra,* 380 U.S. 609, including the evil of pointing up to the jury the defendant's failure to testify. However, the instruction also seeks to prevent the evil condemned by *Griffin* in that it expressly forbids the jury from drawing an inference of guilt from the defendant's failure to testify. Whether or not it is to the defendant's advantage to have the instruction given manifestly is debatable. In any event it is not necessary for the jury's understanding of the case and thus the court did not err in failing to give it on the court's own motion.

 Furthermore, even if it had been error to fail to give the instruction, defendant may not complain since he requested that the instruction not be given, apparently believing it to his advantage not to have the jury's attention drawn to his failure to testify. (Cf. *People* v. *Phillips,* 64 Cal.2d 574, 580-581, fn. 4 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Montgomery,* 255 Cal.App.2d 127, 129 [62 Cal.Rptr. 895] [cert. den. 390 U.S. 1034 [20 L.Ed.2d 292, 88 S.Ct. 1430]].)

4. WHETHER THE JURY SELECTION PROCESS IN ALAMEDA COUNTY MAY BE CHALLENGED ON THIS APPEAL

 No challenge was presented at any time during the trial to the jury selection process. On this appeal counsel submits an order of Superior Court Judge Spurgeon Avakian dated April 18, 1968, in which Judge Avakian found that the intelligence tests employed by Alameda County in selecting trial jury panels improperly "excluded minority groups from jury service, not on the basis of ordinary intelligence, but rather on grounds of their cultural differences from white, middle-class citizens." This issue could have been raised below (see *People* v. *Carter,* 56 Cal.2d 549, 568-569 [15 Cal. Rptr. 645, 364 P.2d 477]). Failure to do so precludes its consideration on this appeal. (*People* v. *Sparks,* 257 Cal.App.2d 306, 310-311 [64 Cal.Rptr. 682].) Counsel has appended declarations to his brief purporting to support the issue herein. In *People* v. *Sparks, supra,* pages 310-311, the court stated, ". . . it is well settled in California that on a direct appeal from a judgment a reviewing court will not consider matters outside

253 Cal.App.2d 820, 830 [61 Cal.Rptr. 368], where such an instruction was given (whether or not on the court's own motion is not stated) the court held that the giving of the instruction was proper and reasoned that the instruction sought to prevent the evil condemned in *Griffin* v. *California, supra,* 380 U.S. 609. *People* v. *Hernandez,* 264 Cal.App.2d 206, 208-212 [70 Cal.Rptr. 330], indicated it agreed with *Brown.* Since here the instruction was not given, we need not decide whether it would have been error to give it on the court's own motion.

the record. . . ." We conclude the issue is not properly before us on this direct appeal.

## 5. EXCLUDING VENIREMEN OPPOSED TO CAPITAL PUNISHMENT

■■■ Six veniremen were excused for cause on the ground of their attitude toward the death penalty. At least two of them were exclued on the basis of a standard that was not permissible under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510.[7] Each of the two expressed opposition to the death penalty and stated that he believed or supposed that his views regarding that penalty would preclude him from giving both sides "adequate or any consideration" or "equal consideration" at the penalty trial but felt that he could be fair on the issue of guilt.[8] Neither made it "unmistakably clear (1) that [he] would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . . or (2) that [his] attitude toward

[7]This was understandable since the trial preceded *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, which sets forth new rules that the states are compelled to follow and to apply retroactively.

[8]The relevant *voir dire* examination of the two veniremen in question is the following:

Venireman Copperud: "MR. WHYTE [the prosecutor] Q. Do you have any moral or religious objections to the imposition of the death penalty? A. Yes, sir, I do. Q. Feel that would preclude you from giving both sides an adequate or any consideration, should you reach that stage of the proceedings? A. I believe it would. MR. WHYTE: Thank you, sir. MR. CULPEPPER [the public defender]: Q. As to this trial as to whether Mr. Gardner was involved in the crime, do you feel you could be fair to both sides on that issue? A. Yes, sir. MR. CULPEPPER: No other questions. THE COURT: Challenge, Mr. Whyte? MR. WHYTE: Yes, Your Honor. THE COURT: . . . Mr. Copperud, the challenge is allowed and you are excused . . . ."

Venireman Gaines: "MR. WHYTE: Q. Mr. Gaines, do you have any moral or religious objections to the imposition of the death penalty if you felt the facts warranted it? A. I don't believe in capital punishment. Q. Do you feel, Mr. Gaines, this would preclude you from giving both sides equal consideration should the proceedings reach that stage? A. I suppose so. MR. WHYTE: Thank you, sir. Challenge for cause, your Honor. MR. CULPEPPER: Q. Mr. Gaines, as to this trial on the issue of whether Charles Gardner was involved in the charge, do you feel you could be fair on that question? A. On that question, yes. MR. CULPEPPER: Thank you. THE COURT: Well, is there any question in your mind, Mr. Gaines, on the subject of the death penalty? Is your conviction on the subject so strong that were the Court to instruct upon the law, and there to be some conflict between your thought on the subject and the law, do you feel in your present state of mind that your philosophy might prevail over what the court stated as the law? A. Well, Your Honor, the reason why I say I don't believe in capital punishment is because to me, it seems that if you got enough money, you know, you don't have to face the gas chamber. THE COURT: Well, have you a firm conviction? Is this your firm thought on the subject? A. Yes. THE COURT: Very well. Thank you very much for your forthrightness. The challenge is allowed and you are excused upon this case, Mr. Gaines . . . ."

the death penalty would prevent [him] from making an impartial decision as to the defendant's guilt.'' Therefore under the compulsion of *Witherspoon* the death penalty must be set aside and defendant remanded to the trial court for a new penalty trial.

6. WHETHER THE IMPOSITION OF THE DEATH PENALTY IN CALIFORNIA IS UNCONSTITUTIONAL

The issues raised have been fully answered by our opinion in *In re Anderson,* 69 Cal.2d 613, 617 [73 Cal.Rptr. 21, 447 P.2d 117].

7. OTHER CONTENTIONS.

Defendant makes several additional contentions relating to the penalty trial. These contentions concern matters that may not arise upon retrial and need not be considered on this appeal.

The judgment is reversed insofar as it relates to penalty; in all other respects it is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety.