[No. B034031. Second Dist., Div. Seven. Nov. 9, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY DUANE TAMBORRINO, Defendant and Appellant.

**COUNSEL**

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, and Kendall Goh, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Richard L. Walker and Karen Bissonnette, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, P. J.**—A jury found defendant guilty of first degree residential robbery, and to be true a firearm use allegation. He admitted two prior serious felony (robbery) convictions. He appeals from the judgment.

## FACTS

### PROSECUTION'S CASE

About 5 p.m. on April 21, as Deborah Clarke entered the front door of an apartment she shared with Tim Dolan, who was then out of town, three men appeared, held guns on her, forced their way into the apartment and ordered her to sit on the couch in the living room and shut up. One of the men held a gun to her head while the other two went through the apartment; she was too scared to look at their faces and did not get a good look at them; she could not see into the bedroom from where she was seated. She described the build of the three men, some facial characteristics, coloring, what they wore and the guns they used. The man who held the gun to her head wore a green and brown camouflage hat which folded down in front and back similar to a hunter's hat, and the gun was small and fit his hand; another man held a handgun and the third, a gun with a large barrel; they were there about 20 minutes.

When they left, the men took everything they could carry including ski equipment, ski boots, warm clothes, VCR, tapes, .35-millimeter camera, a .22-caliber rifle belonging to Dolan, miscellaneous items and a couple of hundred dollars from her purse; they took no jewelry because it was costume, but her jewelry box on the dresser had been moved and was left wide open. The telephone wires in the bedroom had been pulled out from the wall. One of the men ran out to get the car while the other two waited inside; when they left, Clarke ran to the kitchen window and saw the two men run to and throw the stolen items into a small four-door compact car like a Datsun, orange in color (it could have been green or blue for she looked primarily at the license plate), license number 1DHG983, which she copied on a slip of paper. She called police.

When Officer Horn arrived, Clarke was crying and upset and told him she had been robbed. The apartment had been ransacked and disheveled, drawers and clothing had been thrown about the bedroom and furniture had been moved. Clarke thought the men were Latin from the way they were dressed. She described the men to Officer Horn by hair color, complexion, age, height, clothing, weight and firearm; the man who held the gun to her head wore a multi-colored cap with ear flaps. She gave him the paper on which she had written the license number. Later she described the car to him as a small orange two-door vehicle (she was not sure of the color). Police lifted various fingerprints including one from the lid of Clarke's jewelry box; that fingerprint belongs to defendant.

Clarke could not identify defendant as one of the men who robbed her; she had not looked at them much because she was too scared and nervous

and was afraid of being shot, nor was she able to identify defendant's photo from a six-photo lineup shown to her by police, even when he was later pointed out to her. She did not know defendant, had no relationship with him and had never seen him before.

Forty-two days later, at 2:25 p.m., Officer McKillop noticed a blue four-door Datsun with license number 1DHG983; the expiration tag had been tampered with to make the "2" in 1982 look like an "8" for 1988; he pulled the vehicle over; defendant was the driver, his brother, a passenger; in the back was a camouflage-colored hat (identified by Clarke at trial as the type worn by the man who held the gun to her head) and under the driver's seat, a fully loaded .25-caliber semiautomatic handgun (identified by Clarke as like the gun held to her head). Defendant told police his name was Cliff Brown, and was booked under that name. The next day, after waiving his *Miranda* rights, defendant told Detective Brown he was not involved in the incident at Clarke's apartment and had no knowledge of it; the gun found in the car was his; the blue Datsun belonged to his girl friend who also owned an orange Datsun which he used on numerous occasions.

Clarke was cross-examined by defense counsel about her family; she testified she has a sister, Susan, married to Jeff Rogline, Jeff has two brothers, Tony and Chris, and a sister named Kathy who has a child by a man named Eddie Brown. She has never had any relationship with defendant, and never saw him before. On redirect examination she reiterated she never in her life had seen defendant and had never invited him to her home; compared in weight and height with the three robbers, defendant looked "that size exactly." Tim Dolan did not know defendant and had not given him permission to come to the apartment.

### DEFENSE

Defendant denied robbing Clarke. He testified he had known her since she was in high school and had met her several times through Jeff Rogline who lives with Clarke's sister Susan; his (defendant's) stepbrother had a child with Jeff Rogline's sister; he knows Jeff Rogline, Chris, Kathy, Coleen and Donnie.

Defendant did not dispute that the fingerprint on the jewelry box was his. He testified that in April, before the robbery, Clarke "paid me $1,600 to render—[¶] An illegal service that I didn't comply with. [¶] I sold her bunk cocaine that wasn't no good"; Clarke called him at his brother's house and asked him to get her two ounces of cocaine; he went to her apartment and sold her what she thought to be cocaine, but was lactose or "bunk" cocaine, for $1,600; he remembered Clarke's jewelry box because she kept money in

it and from it took $100 bills to pay him; he did not remember touching the box and had no reason to touch it, but must have done so; he left after she paid him the $1,600. He admitted Clarke never told him she was going to "get back at" him for selling her "bunk" cocaine; he never talked to her again. He also admitted he had been convicted of robbery in 1975 and robbery in 1980; as far as he knows Clarke knew about these convictions.

## I

### ATTORNEY-CLIENT PRIVILEGE

At the conclusion of defendant's testimony the following exchange occurred:

"THE COURT: Did you tell your lawyer about the story you just related on the stand?

"MR. TAKAKJIAN [Defense Counsel]: Your honor, excuse me. I must object to the court's question. That violates the attorney-client privilege.

"THE COURT: Did you tell your lawyer what you have testified to on the stand today?

"MR. TAKAKJIAN: May the record reflect my objection?

"THE COURT: Yes, it will so reflect.

"MR. TAKAKJIAN: Thank you, your honor.

"THE COURT: Did you tell your lawyer about this story that you told on the stand?

"THE WITNESS [Defendant]: No. I just told him what it referred to. I didn't tell all, exactly.

"THE COURT: When did you first tell him that?

"THE WITNESS: From the very beginning.

"THE COURT: Well, so he knew about it at the time that Miss Clarke was on the stand, is that correct?

"MR. TAKAKJIAN: Your honor, again my objection is that that violates the attorney-client privilege, sir.

"THE COURT: I know, we have heard that before. [¶] Let's get on with the case. [¶] He knew about it before he was cross examining Miss Clarke, didn't he?" This question the court withdrew.

All discussion thereafter arising out of the foregoing exchange took place out of the presence of the jury. The court disclosed to counsel that the reason for its questions was to determine if defense counsel knew how defendant would testify at the time he cross-examined Clarke and, if he did, before she was excused and possibly could not be recalled, he should have asked her if she bought any cocaine from him. Defense counsel responded that he "made a tactical decision not to ask her those questions," and the prosecutor has a right to recall her.

The prosecutor made an effort to recall Clarke but was unable to get in touch with her; however, he felt it was unnecessary in light of her emphatic denials she had ever known or met defendant. Later the court denied a motion for mistrial holding no privilege had been violated because when defendant testified to the drug deal, he disclosed in court what he had told his counsel thus, he no longer had the privilege.

Appellant contends that the court's questions violated the attorney-client privilege denying his right to counsel, and the error is reversible per se.

### A. Violation of Privilege

■ The questions directed by the court to the defendant can only be properly characterized as within the scope of confidential communications between defendant and his counsel protected by the attorney-client privilege. (Evid. Code, §§ 917, 954; *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 601 [208 Cal.Rptr. 886, 691 P.2d 642].)

### B. No Waiver of Privilege

Defendant's testimony concerning facts that might have been previously related by him to his counsel is not equivalent to disclosure by him of the actual content of an attorney-client communication, and does not constitute a waiver of the privilege. (*Maas* v. *Superior Court* (1985) 175 Cal.App.3d 601, 606 [221 Cal.Rptr. 245]; *Littlefield* v. *Superior Court* (1982) 136 Cal.App.3d 477, 483 [186 Cal.Rptr. 368].) He testified only to facts supporting his defense that he did not rob Clarke, and she "set him up" because he sold her "bunk" cocaine; he did not testify concerning, nor did any of his testimony relate to any communication he might have had with his counsel. We cannot say that defendant's testimony amounted to a disclosure of a confidential communication; it did not constitute a waiver of the privilege.

## C. Chapman Error

■ Appellant argues that the violation of the attorney-client privilege denied him a right to counsel as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, citing various cases here not directly in point. They involve a direct physical invasion of the privacy of consultations between a defendant and his attorney by a government agent who intercepted private telephone consultations between defendant and her attorney before and during trial (*Coplon* v. *United States* ((D.C. Cir. 1951) 191 F.2d 749, 759), posed as a defense assistant, participated in client-attorney consultations and defense plans, and reported to the government matters relating to the pending trial (*Caldwell* v. *United States* (D.C. Cir. 1953) 205 F.2d 879, 880), and posed as a codefendant who was present at confidential attorney-client meetings wherein trial strategy was discussed, and reported all matters to his superiors. (*Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 747 [157 Cal.Rptr. 658, 598 P.2d 818].) This is not our case. But whether or not the error is of constitutional dimensions, we do not agree that it is reversible per se.

■ Not all constitutional errors are reversible per se without regard to the evidence in the particular case. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) This was reiterated by the United States Supreme Court in subsequent cases, "And since *Chapman,* 'we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 106 S.Ct. 1431]. That principle has been applied to a wide variety of constitutional errors. [Citations.]" (*Rose* v. *Clark* (1986) 478 U.S. 570, 576 [92 L.Ed.2d 460, 469, 106 S.Ct. 3101].)

Recognizing that some constitutional errors require reversal without regard to the evidence, *Chapman* gave among examples, a violation of the guarantee of counsel, citing *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]. But *Gideon* involved a complete denial of right to counsel. ■ In the instant case, in the context of defendant's representation by counsel at the trial, there was no such denial, no denial of competent representation, no denial of due process, no denial of a fair trial. If any harm resulted from the judge's questions, it could have only affected the policy upon which strict confidentiality of the attorney-client privilege is based, or created an inference from the fact that having previously known how defendant would testify, defense counsel did not ask Clarke if she ever had a drug transaction with defendant, an inference we cannot conclude, as urged by appellant, resulted in harm to his credibility.

But the judge's questions did not affect the attorney-client relationship between Tamborrino and defense counsel in this trial. We cannot equate this situation with *Gideon*, in which there was a complete denial of the right to counsel, or with the serious breach of confidentiality by the direct invasion by a government agent of the privacy of a defendant's consultation with his attorney in *Coplon, Caldwell* and *Barber*.

In *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 684-685, 106 S.Ct. 1431], quoted in *Rose* v. *Clark, supra*, 478 U.S. at page 577 [92 L.Ed.2d at page 470], the Supreme Court said, " 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it").' " The court concluded that the harmless-error analysis thus presupposes a trial at which the defendant represented by counsel, may present evidence and argument before an impartial judge and jury. (478 U.S. at pp. 578-579 [92 L.Ed.2d at p. 471].)

While defendant says the conduct of a judge must be scrutinized with care because his words carry great weight with the jury, he stops short of assailing Judge Rittenband's integrity, and, indeed, such challenge would be unwarranted. Even defense counsel acknowledged this, "And your Honor, it seems to me very clear that while I know the court in the interests of seeking the truth asked the questions of Mr. Tamborrino in good faith, that yet, these questions were still in error." Of course, the purpose of the court's questions does not validate a violation of the attorney-client privilege, but in this case it does reflect, not on defendant's credibility, as he urges here, but the fact that Clarke was not cross-examined about the drug deal before she was excused which gave her no opportunity to deny it. Though misguided, it was an attempt on the part of the judge to bring out the facts and to establish the truth. (*People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *People* v. *Swanson* (1981) 123 Cal.App.3d 1024, 1030 [176 Cal.Rptr. 915].) The record does not support appellant's belated bare accusation in his reply brief that the judge "was attempting to assume the role of prosecutor." He did not appear to ask the questions for either side; they were asked on neither direct nor cross-examination of defendant; he waited until the conclusion of defendant's testimony. The questions do not imply either the judge's disbelief in defendant's testimony or his belief that defendant's story was a recent fabrication.

Appellant makes no claim he was denied full opportunity to put on evidence and make argument to support his claim of innocence; and, he was tried by a fairly selected, impartial jury. Considering the entire record, we are persuaded that the error was harmless beyond a reasonable doubt.

## D. Harmless Error

 Clarke's testimony is not barren of corroboration. In urging reversal because the prosecution's case was weak, appellant largely ignores the ample circumstantial evidence of substantial significance pointing to his guilt, as he does the problems with his own testimony that bear on his credibility tending to weaken his "I was framed" argument.

It was not disputed that a robbery occurred. The issue at trial was one of identity. But it is not true, as urged by appellant, that the jury had to resolve the issue by accepting either his testimony or that of Clarke. It is true the jury could have accepted his simple denial of participation in the robbery, but she at no time accused him of being one of the robbers. The bulk of his testimony related to a narcotics sale. He claimed he sold her "bunk" cocaine for $1,600 which she paid him in $100 bills she took from her jewelry box which he saw and might have accidentally touched. This, he argued, explained away the presence of his fingerprint on the jewelry box, and implied Clarke framed him to get even with him, in order to account for her identification of the license number of the Datsun, the camouflage hat in the car and the handgun he admitted belonged to him.

He claimed his stepbrother fathered a child born to Clarke's brother-in-law's sister; she readily testified that her brother-in-law has a sister who had a child by an Eddie Brown. However, there is no evidence that she had ever seen Eddie Brown, knew Eddie Brown or knew of any claimed relationship between defendant and Eddie Brown.

Assuming the jury accepted defendant's testimony in this regard and that Clarke did know him and did have a cocaine transaction with him, it could reasonably believe that a short time thereafter, defendant returned to rob her of the $100 bills he knew she kept in her jewelry box, and either the distant family connection made her reluctant to point the finger at defendant, or fear accounted for her failure to identify a man who not only forced his way into her home and held a handgun to her head but drove around with a loaded .25-caliber semiautomatic handgun under the driver's seat—indeed, someone to be reckoned with.

Clarke never accused defendant of having been one of the three men who entered her apartment and robbed her. She was adamant that she did not

know defendant and had never seen him before. She made no in-court identification of him and said she was not able to identify defendant at the pretrial photo lineup. On the other hand, it seems only reasonable that if Clarke was trying to "set up" defendant, she would have readily identified him, particularly from the photo lineup.

Defendant did not testify he thought he was or was being framed by Clarke; he admitted Clarke never told him she was going to "get back" at him for selling her "bunk" cocaine, in fact, he said he had never talked to her again. And he never explained how she would know about the orange Datsun and identify the camouflage hat and loaded gun found in the car when he was arrested.

Appellant places great emphasis on his testimony that he knew Clarke through a distant family connection. Thus, it is curious that defendant previously made no such claim. While he denied to police any involvement in the robbery, he did not mention that he knew Clarke. It is also curious that between his first arrest and release, and his subsequent rearrest, he did not contact Clarke. Further, the only evidence that defendant knew Clarke through the Rogline family was his own testimony. One wonders why, among all of the Roglines he claimed to know, he did not call at least one of them to corroborate his testimony; any one of the Roglines mentioned could have verified his claim.

In addition to all of the evidence which connected defendant to the robbery—his possession of a Datsun with license number 1DHG983, an orange Datsun he used on numerous occasions, the type of distinctive hat worn by the robber who held the gun to Clarke's head, found in the Datsun and his possession of a loaded handgun (he admitted was his) which looked like the gun pointed to her head—is his fingerprint on the jewelry box. ■ Fingerprint evidence is " 'the strongest evidence of identity, and is ordinarily sufficient alone to identify the defendant.' (*People* v. *Gardner* (1969) 71 Cal.2d 843, 849 [79 Cal.Rptr. 743, 457 P.2d 575].)" (*People* v. *Bailes* (1982) 129 Cal.App.3d 265, 282 [180 Cal.Rptr. 792].) ■ The jury was entitled to draw its own inferences as to how defendant's print came to be on the box and when.

Defendant gave a false name to police when he was arrested and booked. He also admitted two prior felony convictions—two robberies, in 1975 and 1980 respectively.

Clarke told Officer Horn that the car in which the robbers had departed was a small two-door orange Datsun with license number 1DHG983. When defendant was arrested he was driving a blue four-door Datsun but with

license number 1DHG983, the expiration tag on which had been tampered with in an effort to make the "2" in 1982 look like an "8" in 1988. However, he told police the car belonged to his girlfriend who also owned a two-door orange Datsun which he used on numerous occasions. The inference is reasonable under the circumstances, including the altered expiration tag, that defendant switched the license plate after the robbery.

All of the foregoing hardly portrays defendant as a witness of sterling credibility. Moreover, we cannot perceive, nor does appellant demonstrate how the violation of the attorney-client privilege here implied a challenge to his credibility which "severely prejudiced his trial." He points to the jury's request for a reading of his testimony, but on the record before us, we cannot speculate that this implied the jury believed it was a close case or it had some question about whom to believe.

Finally, it had to be obvious to the jury, from the very nature of the questions defense counsel asked Clarke on cross-examination and defendant on direct examination, and long before the judge ever questioned defendant, that defendant had told his counsel of his proposed testimony—that he knew Clarke and had a drug transaction with her. Had it been otherwise, defense counsel would have had no reason to ask Clarke questions that appeared to be irrelevant to the robbery—about $100 bills, the denomination of bills taken from her purse during the robbery and any reason she may have had to carry a $100 bill around with her. He could not have asked such questions had he not known in advance defendant's testimony, for they were asked to support his defense that he had a drug deal with Clarke and she paid him in $100 bills she took from her jewelry box. He also asked Clarke at length about her relatives, at that time so foreign to the robbery as to evoke a comment of immateriality. But it is clear, after defendant's testimony, that his counsel had no purpose to ask Clarke such questions except to bolster his client's defense. In this regard, defense counsel could have drawn the kind of testimony he did from Clarke only if he had been given the information by defendant sometime before. And he was careful in his trial strategy. He asked Clarke the details of her brother-in-law's family but did not ask her if she knew or had ever seen Eddie Brown or if she knew of any relationship between him and defendant, and he did not ask her if she ever had a drug deal with defendant. Further, he did not call any of the Roglines to support defendant's testimony. It is readily apparent that the court's questions of defendant did not tell the jury anything it did not already know, as it was clear long before then that defendant had told defense counsel his story; and the jury did not need a violation of the attorney-client privilege to tell them that as a matter of trial strategy, defense counsel had not questioned Clarke about the drug deal and that in any case, it was not his responsibility to do so.

Appellant has not persuaded us of any harm resulting to his credibility. A careful reading of the trial testimony convinces us that defendant's case was lost because of the strength and persuasiveness of the People's evidence, and the weakness of his own uncorroborated testimony.

## II

### ADMISSION OF PRIOR FELONY CONVICTIONS
### NO ABUSE OF DISCRETION

Two prior felony convictions, both robberies, in 1975 and 1980, were admitted in evidence for purpose of impeachment. ■ "Under *Castro* the trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes, and must exercise that discretion on motion of the defendant. The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded." (*People* v. *Collins* (1986) 42 Cal.3d 378, 387, 389 [228 Cal.Rptr. 899, 722 P.2d 173].)

■ The factors relevant to any application of Evidence Code section 352, and those the trial court should consider in exercising its discretion are found in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]. They include the relationship between the prior felony conviction and credibility; nearness or remoteness in time of the prior felony to the present offense; similarity of the prior felony to the crime for which the accused is on trial; and what the effect would be if defendant elects not to testify. (P. 453.) Other circumstances of the case that may be relevant to the issue may also be taken into account. (*People* v. *Collins, supra,* 42 Cal.3d 378, 391-392.) ■ It cannot be denied on the record before us that the court exercised its discretion and indulged in the weighing process under section 352. However, appellant contends that the record does not, but must, include its reasoning process and affirmatively show that the trial court did in fact weigh prejudice against probative value under the statute. (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) The following tells us defendant's position is not well taken.

A *Beagle* (*People* v. *Beagle, supra,* 6 Cal.3d 441) motion was informally discussed in chambers, defense counsel cited cases upon which he relied, and the court read and considered them. Later in the trial, counsel formally moved to exclude the two felony convictions, again citing *Beagle, supra, People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] and *People* v. *Collins, supra,* 42 Cal.3d 378. He pointed specifically to the factors in *Beagle* "that the court should consider in using its discretion": the prior

must reflect on honesty and integrity, which he did not contest; remoteness in time, directed to the 1975 robbery, on the theory that if one is able to stay out of trouble for that period of time, it should not be used; conduct similar to or the same as that for which accused is being tried, and here the offenses are identical; and, reminding the court of its duty under section 352, Evidence Code, to weigh and balance the *Beagle* factors in making its decision, the effect if defendant elects not to testify. Defense counsel pointed out that defendant may be the sole defense witness, and reminded the court that it has the discretion to exclude the priors because of prejudice to defendant.

In response, the prosecutor reemphasized the discretion the court has in determining whether to exclude the prior convictions. He argued on the last issue that defendant should not be allowed to blackmail the court; as to remoteness, that this defendant has not been "problem free or offense free for several years"; and on the issues of identical conduct, that there is no known issue of identical conduct, that there are no known prior felony convictions against Tamborrino the prosecution could use other than the two robberies.

The court participated in the rather lengthy discussion asking various questions, then said, "I have seriously considered under 352 whether or not to allow impeachment of the defendant, if he takes the stand, of these priors which have been alleged against him. [¶] I think in view of all of the circumstances in this case it is highly relevant."

One cannot read the foregoing exchange without concluding that, indeed, the court was aware it had discretion to exclude the two prior robbery convictions, and it exercised that discretion; was aware of the *Beagle* factors and that it had to consider them, and did so; was aware it had to engage in a balancing process under Evidence Code section 352 to determine whether the probative value of the evidence of the two prior felony convictions is substantially outweighed by the possibility that its admission will create substantial danger of undue prejudice, and did so. Although the court did not engage in a formal on-the-record evaluation of the factors affecting the weighing process, and *Green* does not so require, there can be no doubt that its conclusion was the result of a weighing process. (*People* v. *Holt* (1984) 37 Cal.3d 436, 453 [208 Cal.Rptr. 547, 690 P.2d 1207].) Here, the trial court furnished us with a record necessary for meaningful review of appellant's claim of abuse of discretion and to ensure that the ruling on the motion was the product of a mature and careful reflection on its part which, after all, is the reason for requiring an affirmative showing that the trial court did in fact weigh prejudice against probative value. (*People* v. *Montiel* (1985) 39 Cal.3d 910, 924 [218 Cal.Rptr. 572, 705 P.2d 1248]; *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].)

██ There is manifest no abuse of the trial court's discretion. Defendant's credibility would be the crucial issue for the People as well as for the defendant if he took the stand and denied the robbery or gave an explanation for the presence of his fingerprint on Clarke's jewelry box. There were no eyewitnesses to the robbery except Clarke who was unable to identify defendant. The priors would be highly probative on the issue of defendant's credibility. (*People* v. *Stewart* (1985) 171 Cal.App.3d 59, 66 [215 Cal.Rptr. 716].)

If a prior felony conviction has been followed by a legally blameless life, remoteness is important. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 453.) Thus, the court may consider defendant's conduct subsequent to the prior conviction. (*People* v. *Massey* (1987) 192 Cal.App.3d 819, 825 [237 Cal.Rptr. 734]; *People* v. *Burns* (1987) 189 Cal.App.3d 734, 737, 739 [234 Cal.Rptr. 547]; *People* v. *Dillingham* (1986) 186 Cal.App.3d 688, 695 [231 Cal.Rptr. 20].) Defendant was sentenced to state prison on the 1975 robbery and discharged from parole on September 27, 1979; in 1980 he was convicted of another robbery, and of receiving stolen property. That defendant did not get into trouble with the law between convictions after 1975, seems to be because he was incarcerated most of that time.

While before passage of Proposition 8, past offenses similar or identical to the offense on trial were excluded, now the rule of exclusion on this ground is no longer inflexible (*People* v. *Foreman* (1985) 174 Cal.App.3d 175, 180 [219 Cal.Rptr. 759], quoting *People* v. *Castro, supra,* 38 Cal.3d 301, 312). As for their potential prejudicial impact, it is true that they were identical to the crime charged, but that fact no longer compels their exclusion. (*People* v. *Dillingham, supra,* 186 Cal.App.3d 688, 695; *People* v. *Stewart, supra,* 171 Cal.App.3d 59, 66.) Defendant has a rather substantial criminal record dating from 1969, but because several of the serious crimes were converted to misdemeanors, no other prior felony convictions were available for impeachment.[1] (See *People* v. *Foreman, supra,* 174 Cal.App.3d 175, 182.) "No . . . defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (See *People* v. *Beagle, supra,* 6 Cal.3d 441, 453.).

We note that the court gave a limiting instruction (CALJIC No. 2.23) that a witness's prior convictions can only be considered for the purpose of

---

[1] 1969 Burglary (California Youth Authority commitment).

1974 Parole violation after escape; discharged October 30, 1975.

1975 Robbery (state prison); paroled 1978, discharged 1979.

1980 Receiving stolen property (county jail).

1980 Robbery (armed) (state prison); paroled 1984, discharged 1985.

1986 False representation of identity to police officer (county jail).

1986 Disorderly conduct (county jail).

determining his credibility. We are also aware that defendant used the two prior robbery convictions to his benefit by testifying that, as far as he knew, Clarke knew of these convictions, and argued that because of this she knew she could and did "set him up" for another robbery charge.

## DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.**—I respectfully dissent.

I agree with the majority in its conclusion the trial court breached the attorney-client privilege by asking a defendant whether he had previously told his lawyer the same version of the facts he was testifying to on the stand. However, I see this error as fundamental and egregious. I find this error constituted a denial of the right to counsel and thus is reversible per se, or if not reversible per se is reversible under the *Chapman* standard.

The majority opinion repeats most, but not all of the colloquy between the trial judge, the defendant, and the defense attorney. To capture the full flavor of the exchange, I will repeat the entire dialogue.

As will be recalled, it occurred during the presentation of the defendant's case shortly after appellant for the first time revealed that Deborah Clarke falsely accused him of robbery because he had previously sold her two ounces of bad cocaine. While Mr. Tamborrino was on the stand, the following exchange took place in front of the jury: "THE COURT: Did you tell your lawyer about the story you just related on the stand?

"[Defense Counsel]: Your Honor, excuse me. I must object to the court's question. That violates the attorney-client privilege.

"THE COURT: Did you tell your lawyer what you have testified to on the stand today?

"[Defense Counsel]: Your Honor, may the record reflect my objection?

"THE COURT: Yes, it will so reflect.

"[Defense Counsel]: Thank you, your Honor.

"THE COURT: Did you tell your lawyer about this story that you told on the stand?

"THE WITNESS [APPELLANT]: NO. I JUST TOLD HIM WHAT IT REFERRED TO. [¶] I DIDN'T TELL ALL, EXACTLY.

"THE COURT: When did you first tell him that?

"THE WITNESS [APPELLANT]: FROM THE VERY BEGINNING.

"THE COURT: Well, so he knew about it at the time that Miss Clarke was on the stand; is that correct?

"[Defense Counsel]: Your Honor, again my objection is that that violates the attorney-client privilege, sir.

"THE COURT: I know. We have heard that before. [¶] Let's get on with the case. [¶] He knew about it before he was cross-examining Miss Clarke, didn't he?

"[Defense Counsel]: Your Honor, may we be heard at the side bar, please?

"THE COURT: No.

"[Prosecutor]: May we approach, your Honor?

"THE COURT: Yes. [¶] I will withdraw the last question."

Defense counsel subsequently moved for a mistrial which the trial court denied on grounds his questions did not violate the attorney-client privilege. This motion was renewed on several occasions later in the proceedings and was denied each time as the trial judge continued to insist he had not committed error.

The threshold question is whether a trial judge who questions a defendant on the stand regarding the disclosure of the defendant's testimony to his attorney is violating the defendant's privilege to maintain the confidentiality of communication with his attorney. Although the majority concedes the trial court indeed violated appellant's privilege in this case, they understate the significance of this violation.

In criminal cases, the attorney-client privilege implements the Sixth Amendment guarantee of right to assistance of counsel.[1] It affords a defendant adequate and competent legal representation resulting from full disclosure of the facts by the client to his attorney.[2] Evidence Code section 917 presumes any communication between attorney and client to be confidential.[3] At the same time, section 954 of the Evidence Code grants the client the "privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." Moreover, this privilege may be claimed by either the client or the lawyer.[4]

In this case, there is no question the communication between appellant and his lawyer clearly fell within the confidentiality presumption in Evidence Code section 917. The respondent sought to distinguish between the relationship, which it concedes is protected, and the content of the communication between attorney and client, which respondent claims is not. The court in *Barber* v. *Municipal Court, supra,* 24 Cal.3d 742, further elaborated the rationale behind the confidentiality presumption of the privilege. The court recognized counsel's duty to fully investigate the facts of the case. Additionally, "[a] primary source of such information is the accused himself. Often, whether guilty or innocent of the offense charged, the accused knows facts pertinent to his defense which may tend to incriminate or embarrass him. . . . [¶] It is for this reason that the courts have recognized

---

[1] *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818].

[2] In *McMann* v. *Richardson* (1970) 397 U.S. 759, 771, footnote 14 [25 L.Ed.2d 763, 773, 90 S.Ct. 1441], the Supreme Court has held, "It has long been recognized that the right to counsel is the right to the effective assistance of counsel."

[3] "Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential." (Evid. Code, § 917.)

[4] Evidence Code section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

"(a) The holder of the privilege;

"(b) A person who is authorized to claim the privilege by the holder of the privilege; or

"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure.

"The relationship of attorney and client shall exist between a law corporation as defined in Article 10 (commencing with Section 6160) of Chapter 4 of Division 3 of the Business and Professions Code and the persons to whom it renders professional services, as well as between such persons and members of the State Bar employed by such corporation to render services to such persons. The word 'persons' as used in this subdivision includes partnerships, corporations, associations and other groups and entities."

that the right to counsel guaranteed by the California Constitution embodies the right to communicate in absolute privacy with one's attorney."[5]

Thus, defense counsel rightfully objected to the court's intrusion into the privilege. The instant case illustrates one of the vices of allowing this sort of infringement on attorney-client confidentiality. From appellant's response to the court's questioning it appears appellant may have confided in his attorney that he had sold a controlled substance, a criminal activity. Were it not for the absolute guarantee of confidentiality, appellant may have refrained from disclosing this vital information to his counsel. It was the "absolute privacy with one's attorney" which prompted him to provide counsel with facts which rebutted the victim's testimony.

Furthermore, contrary to the lower court's holding, the defendant did not waive the privilege when he took the stand in his own defense and testified about the narcotics transaction with Ms. Clarke. According to Evidence Code section 912 a waiver of the attorney-client privilege occurs if the holder of the privilege "has disclosed a significant part of the communication" to third parties.[6] "However, a client does not waive the privilege by testifying about facts which might have been discussed in confidential conversations with his or her lawyer, as such testimony is not equivalent to disclosure of the actual content of those attorney-client conversations."

---

[5] *Barber* v. *Municipal Court, supra,* 24 Cal.3d at page 751.

[6] Evidence Code section 912 states: "(a) Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege), 980 (privilege for confidential marital communications), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), 1033 (privilege of penitent), 1034 (privilege of clergyman), *or 1035.8 (sexual assault victim-counselor privilege)* is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which *the holder* has the legal standing and opportunity to claim the privilege.

"(b) Where two or more persons are joint holders of a privilege provided by Section 954 (lawyer-client privilege), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), *or 1035.8 (sexual assault victim-counselor privilege),* a waiver of the right of a particular joint holder of the privilege to claim the privilege does not affect the right of another joint holder to claim the privilege. In the case of the privilege provided by Section 980 (privilege for confidential marital communications), a waiver of the right of one spouse to claim the privilege does not affect the right of the other spouse to claim the privilege.

"(c) A disclosure that is itself privileged is not a waiver of any privilege.

"(d) A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), *or 1035.8 (sexual assault victim-counselor privilege),* when such disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer, physician, psychotherapist, *or sexual assault counselor* was consulted, is not a waiver of the privilege." (Italics added.)

(*Maas* v. *Superior Court* (1985) 175 Cal.App.3d 601, 606 [221 Cal.Rptr. 245], citing *Littlefield* v. *Superior Court* (1982) 136 Cal.App.3d 477 [186 Cal.Rptr. 368].) In *Littlefield* v. *Superior Court,* the defendant asserted the need to inquire into the attorney-client discussions of the prosecution witness who had negotiated a guilty plea to the underlying murder charges. The court found no merit whatsoever in the argument "that a client's testimony to facts that were possibly a topic of confidential conversations with his defense counsel is equivalent to the client testifying to the actual content of those attorney/client conversations."[7]

Similarly, Mr. Tamborrino did not waive his privilege when he took the stand in his own defense. Concededly, he did relate a different version of the facts than the prosecution's chief witness, Ms. Clarke. But this was his testimony as to what happened and why allegedly the victim fingered him and his vehicle. It did not purport to be an account of his conversation with his attorney about what happened. Accordingly, under Evidence Code section 912 this testimony does not represent a disclosure of the confidential communication and therefore does not constitute a waiver. Whether appellant had possibly discussed these same events with his attorney, and whether his attorney knowingly failed to cross-examine Ms. Clarke on the stand about these events are facts within the province of the privilege and are protected from disclosure at any time—and especially in court before a jury trying the client for a criminal offense. Thus, the trial judge breached a privilege which the defendant had not waived. This was error of the most obvious and fundamental nature. And it was error of constitutional dimension.

The majority and I agree this was error. I now turn to our point of disagreement—whether this clear error was reversible. The majority admit this blatant breach of the attorney-client relationship qualifies as federal constitutional error and thus the *Watson* standard of review does not apply. At the same time they argue the error is not reversible per se. Instead they contend the appropriate standard is the one set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. I believe a strong argument can be made in favor of per se reversal where a trial judge drags before the jury confidential information protected by the attorney-client relationship.[8] This kind of behavior does so much harm to

---

[7]*Id*. at page 483.

[8]I found no cases in California or the federal system which expressly consider whether a Sixth Amendment violation of the type which occurred here is reversible per se although some courts have applied the *Chapman* standard without discussion. (See, e.g., *United States* v. *Arthur* (4th Cir. 1979) 602 F.2d 660, 664; *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751, 759-760 [139 Cal.Rptr. 61].) The case which most closely discusses this issue is *Bishop* v. *Rose* (6th Cir. 1983) 701 F.2d 1150.

In *Bishop,* the prosecution obtained a privileged communication from the defendant to his attorney. The prosecution was permitted to use the statement to attack the defendant's credi-

the constitutional right to counsel not just in this case but in discouraging full and open communication between defendants and their attorneys in future cases that it warrants the sharpest possible sanction. Despite this concern, however, I nonetheless apply the *Chapman* standard in this dissent since, properly construed, this test likewise dictates reversal of the instant case.

The *Chapman* standard is reserved for error, such as that in the instant case, so grievous it violates the United States Constitution. Where error of this dimension is present the appellate court is *required* to *reverse* unless it can fairly find *beyond a reasonable doubt* that the defendant would have been convicted even if the error had not been committed. "[The] beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710].) To reach this conclusion, the reviewing court must find that after eliminating the error and assuming the jury had only heard the remainder of the trial a reasonable juror *could not* have entertained a *reasonable doubt* about defendant's guilt.

One of my problems with the majority opinion is that it appears to misapply the *Chapman* standard. It presents a good closing argument for the prosecution demonstrating there was sufficient evidence to convict appellant even without the inferences which might have flowed from the trial court's invasion of the attorney-client relationship. But the *Chapman* standard requires more, much more. It is not enough the remaining evidence is sufficient so a reasonable juror *could* find the defendant *guilty* after stripping away the erroneous matter. The remaining case against the defendant must be so overwhelming a reviewing court can fairly say *no reasonable juror could have had a reasonable doubt* the defendant is guilty. Bearing that question in mind, let us review once again the evidence in this case.

The prosecution's chief witness was Deborah Clarke. Essentially all of the prosecution's evidence—the multicolored hat, the small gun, and the color and license plate number of the getaway car—emanated from Ms. Clarke. There were no other witnesses to the alleged crime. Ms. Clarke

---

bility during cross-examination. The court of appeals concluded the use of that statement violated the defendant's Sixth Amendment rights. The court went on to consider whether such a violation warranted reversal. "Assuming without deciding that a Sixth Amendment violation by interference with the confidential relationship between a defendant and his attorney is subject to the harmless error rule, we conclude it would be impossible to find beyond a reasonable doubt that the conduct of the prosecutor did not contribute to petitioner's conviction." (*Id.* at p. 1157.)

reported the alleged robbery and provided the police with the description of the robbers, their clothing, their guns and their car. The majority attempts to make much of the fact these articles all matched the descriptions Ms. Clarke gave. Actually her descriptions were so vague, except for the license number, they could have fit a wide range of guns, hats, etc., which were never even near her house to say nothing of being involved in the alleged robbery. But that is not the real point. If one accepts appellant's explanation of her motives, she easily could have observed the car appellant was driving when stopped including its license number, the gun, the hat, and the rest on an earlier occasion. So all of this evidence, not only about the identity of the robbers but that she was robbed at all, came directly and solely from Ms. Clarke.

In fact, the only evidence independent of Ms. Clarke's testimony was the defendant's fingerprint on Ms. Clarke's jewelry box. A lone fingerprint, however, does not prove appellant's guilt. All it indicates is that the defendant touched the box at some point and for some reason. Once again we only have Ms. Clarke's testimony suggesting the box was touched by someone who was involved in the alleged robbery.

Appellant took the stand and gave an alternate explanation for the presence of his fingerprint on the box as well as for Ms. Clarke's testimony against him. Appellant testified Ms. Clarke falsely accused him of robbery because he had sold her some bad cocaine for $1,600 at some prior time. The sale allegedly took place at Ms. Clarke's house. Appellant testified he must have touched the jewelry box at that time.

Thus the jury was presented with a classic credibility contest between victim and defendant. Appellant's story, if believed, accounted for and discredited all the evidence against him. On the other hand, the victim's story, if believed, provided sufficient evidence to sustain a verdict of guilty beyond a reasonable doubt. Thus, any *error* in the proceeding which tended to significantly impugn appellant's credibility would tip the balance against him and toward conviction.

The damage was done when the trial judge, improperly, and over defense counsel's objection, questioned appellant about his conversations with his attorney. Whether and when appellant told his trial counsel he had been selling drugs and that the victim was a dissatisfied customer is absolutely privileged. Neither prosecutor nor judge may bring this privileged information before the jury. They may not do so for any purpose and especially not when the effect would be to discredit appellant's testimony on the stand. Yet that was the clear effect, and possibly the purpose, of this line of inquiry in the instant case.

No matter how appellant responded it could reflect on the credibility of his version of the facts. If he replied he had not told his attorney about these events it would suggest they never happened because why would a defendant withhold such vital evidence from his lawyer if it were true. This inference would be drawn even if defendant withheld the information from his attorney because it required admitting he was a drug trafficker or for some other good reason. Conversely, if appellant replied he had told his attorney about these events earlier, it would suggest they never happened because the attorney had not referred to them at any time earlier in the trial. This inference would be drawn even if the attorney, as a tactical matter, had decided to hold this defense in reserve in hopes the prosecution's case would falter in some other way. After all, this defense is a two-edged sword. Appellant had to confess in open court to commission of one felony—drug trafficking—in order to urge his innocence of another—robbery. However, no matter how appellant answered these questions about the whether and when of his confidential communications with his lawyer his credibility would have been impugned.

As it was, appellant responded to this unexpected, unjustifiable intrusion into the confidential relationship between himself and his lawyer by hemming and hawing, ultimately saying he had told his lawyer something about these facts but not everything. This answer might well have hurt his credibility with the jury more than either a forthright admission or denial he had revealed these facts to his lawyer on an earlier occasion.

There would be only one way to counter these obvious inferences that appellant was lying. Appellant's lawyer would have had to take the stand and explain to the jury his trial strategy and the reasons either he or his client failed to reveal this information earlier and why he had not cross-examined Ms. Clarke about the narcotics transaction when she was on the stand. Thus, the only way to overcome the prejudice caused by any inquiry into the whether and when of a confidential attorney-client communication is to further expand the inquiry and thus further eviscerate the attorney-client privilege.

The concerns discussed thus far support the conclusion any inquiry into the whether and when of a confidential communication about matters any defendant testifies to at trial is likely to impugn that defendant's credibility or force further invasions of the attorney-client privilege, or both. But in the instant case the damage was compounded by what the trial judge did once appellant responded to his inquiry. The judge asked a rhetorical question which underscored for the jury that appellant's counsel "knew about it [defendant's version] at the time that Miss Clarke was on the stand; . . ." And a few moments later he underscored this inference again. "He knew

about it before he was cross-examining Miss Clarke; . . ." From these rhetorical questions, a reasonable juror could and probably would gather the trial court doubted the defense attorney would have refrained from cross-examining Ms. Clarke about the narcotics transaction if he indeed both knew about it and actually believed his own client.

It is indisputable "the judge is a figure of over-powering influence, . . . whose every word is received attentively and acted upon with alacrity and without question" by the jury. (*Travelers Insurance Company* v. *Ryan* (5th Cir. 1969) 416 F.2d 362, 364.) Not satisfied to allow the jurors to draw their own inferences from appellant's responses to his improper line of inquiry, this trial judge drew their attention to his own inference not once but twice. In doing so, the judge assumed the adversarial role of the prosecutor and exhibited his personal disbelief of appellant's testimony. Furthermore, what the judge said implied the defense counsel did not believe his own client's testimony.

(I note this was not the first time during the trial this judge took up the cudgels for the prosecution. A half dozen times earlier he took over questioning from the prosecutor and on several of those occasions concluded with rhetorical questions which actually stated inferences to be drawn from the previous answers, incidentally all of these inferences favorable to the prosecution. However, be clear I am not arguing those incidents are grounds for reversal. Rather I am suggesting this was a very active trial judge whose questions and inferences would likely have "over-powering influence" with the jurors. They were accustomed to hearing this sort of guidance from the judge and could have been expected to give great weight to what he said, even when his questions and inferences were highly improper, indeed where they violated the Constitution.)

I find it difficult to deny that both the trial judge's improper questions and the inferences he drew for the jury during that inquiry significantly impugned the credibility of appellant's testimony. Especially in the context of a classic one-on-one credibility contest—as this case presents—how can one find such error harmless?

This is not a case where several witnesses gave independent accounts each corroborating the other and the error only infects one of those witnesses. Nor is it a case where appellant's guilt is established by laboratory tests and the error only reflects on witnesses whose testimony is not essential to proof of guilt. Instead here the People's entire case against the appellant rests ultimately on the testimony of a single person. Appellant's testimony, if believed, fully explains why this person would testify falsely against him

and, furthermore, accounts for the prosecution's only other evidence, the fingerprint.

The trial judge himself recognized just how close a case this was and how much it depended on the jury's evaluation of the credibility of these two witnesses. Before the appellant had taken the stand to present his competing version of the truth, the prosecution asked whether it could introduce appellant's two previous felony convictions to impeach his anticipated testimony. The judge granted the request principally because he felt the case against appellant was not strong and thus his credibility was a crucial factor. "Had there been evidence which clearly indicated, in other words, if he had been caught in the act of doing the robbery it would be different. But there has been no eyewitness testimony here that he actually committed this particular offense. So all of the surrounding circumstances and considering also his background with respect to criminal activity is highly relevant in determining his guilt or innocence and I will permit the people to do that."

Recognizing, as did the trial judge, that the instant case was essentially a credibility contest, it is even more significant the judge then embarked on an improper inquiry and pointedly used the results of that inquiry to discredit the part of appellant's testimony which contradicted the sole witness against him. The majority emphasizes this invasion of the attorney-client privilege was innocently motivated. I do not question that, especially since the judge insisted to the end he was not violating attorney-client confidentiality and only wanted to find out if the defense counsel had deliberately avoided cross-examining Ms. Clarke about the alleged narcotics transaction. (Of course, appellant's counsel would have been well within his rights to have held back on this defense until his client could develop it fully on the stand.) But in any event, the trial judge's motive in asking these questions and stating these inferences is irrelevant. Whatever the motive, he committed constitutional error. And whatever the motive, that constitutional error brought out evidence and raised inferences that grievously damaged appellant's credibility—and that of his attorney—and cast serious doubt on the genuineness of his entire account.

Were I a juror and not an appellate judge, I might well have joined the majority of this court in finding Ms. Clarke's version more credible than appellant's even without the evidence and inferences which emerged from the trial court's improper inquiry into appellant's confidential communications with his trial counsel. But that is not our role. The jurors not the appellate courts are the judges of credibility. Because of what the trial court did in this case, appellant was deprived of the opportunity to have this credibility contest decided by those charged with the responsibility of decid-

ing such contests, the jurors, without the taint of improper evidence and improper inferences the judge drew for them himself.

The majority opinion itself concedes that after stripping away the judge's error a reasonable juror could have believed the appellant sold bad cocaine to Ms. Clarke yet also believed he returned later to rob her. But in doing so, the majority actually is conceding the error is reversible under *Chapman*. For, if a reasonable juror could believe the appellant indeed sold bad cocaine to Ms. Clarke, he or she could also reasonably infer Ms. Clarke sought revenge against appellant by implicating him in a robbery charge. In fact to find reversible error under *Chapman* it is not necessary to find a reasonable juror could actually believe the defendant's version. It is enough such a juror could entertain a *reasonable doubt* that version might be true.

If ever there is a type of case where error is almost never "harmless" under *Chapman,* or even *Watson,* it is the one-on-one credibility contest. For seldom can it be said that as a matter of law, the jury must find one person credible and the other incredible. And, if there ever was a one-on-one credibility contest where the error reflected directly and prejudicially on the defendant's credibility, it is this case. Here it was not something the prosecution said or asked or did which wrongfully impugned appellant's credibility. A juror might tend to discount attacks, proper or improper, which come from that quarter. But here the assault on appellant's credibility came from and bore the imprimatur of that neutral, powerful figure, the trial judge. In these circumstances, to my mind there is no responsible way a reviewing court could conclude the People have proved "beyond a reasonable doubt" that had the trial judge not committed these errors, the jury still would have reached the same verdict. Accordingly, under *Chapman* I would reverse.

Appellant's petition for review by the Supreme Court was denied February 21, 1990.