Filed 6/18/21  P. v. Mixon CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077235 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD280174) |
| MICHAEL ANTHONY MIXON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Anthony Mixon of burglary, grand theft, and vandalism in connection with a "hole-in-the-wall" burglary of a T-Mobile store.  The perpetrator (or perpetrators) broke into a vacant, adjacent store,

cut holes in the shared wall to gain access to the T-Mobile store, disabled the security systems, and then used power tools to cut into the safes and secured areas to take the store's cash and high-end inventory. Mixon's DNA was found on towels left at the crime scene. His cell phone records indicated he was in the area before and after the crimes were committed, and his phone was shut off or otherwise out of service while the crimes were being committed. Evidence connected Mixon to four prior burglaries in which the perpetrators used the same techniques, knowledge, and skills to burglarize other electronics stores in a similar manner. Mixon contends the evidence is insufficient to support his conviction. We reject Mixon's contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Information*

In August 2019, an information charged Mixon and a codefendant, Jorge Francisco Cuadra, with grand theft of personal property with value exceeding $950 (Pen. Code, § 487, subd. (a); count 1), burglary (*id*., § 459; count 2), and vandalism with an amount of destruction of $10,000 or more (*id*., § 594, subds. (a), (b)(1); count 3).[1] It was further alleged that Mixon had six separate prison priors (§§ 667.5, subd. (b), 668).

### B. *Trial*

#### 1. *Prosecution's Case*

##### a. *Instant Offense: San Diego T-Mobile Store*

On July 2, 2018, employees at a San Diego T-Mobile store came to work at approximately 9:15 a.m. and discovered the alarm system had been

---

[1] Unless otherwise indicated, statutory citations are to the Penal Code.

deactivated.[2]  Further investigation revealed that a hole had been cut through the drywall in the back room.[3]  Wires for the alarm system and video surveillance system had been cut.  The safes had been cut open, and the cash was gone.[4]  New, high-end cell phones had been stolen from the adjacent inventory room.[5]  Employees testified the back room "smelled awful," like "burnt metal."  There were metal shavings on the floor next to the safe.

Employees observed several white towels or rags that had not been left by any of the employees and did not belong to T-Mobile—the store only used blue microfiber towels.  The white rags were discovered in the back room in the same area where the hole in the wall was located; some rags were present on the manager's desk, on the floor near the room which housed the security control panels, and on a cart that had been moved into the inventory room to

---

[2]  The company monitoring the alarm system called at 4:00 a.m. and 5:17 a.m. to notify a T-Mobile employee that the alarm had been triggered, but the calls went to voicemail as the employee slept.

[3]  The back area of the T-Mobile building was separated by a hallway from the sales floor in front of the store.  The employee first entering the store did not notice anything out of place on the sales floor.

[4]  The safe had two levels.  An employee estimated that approximately $800 was taken from the bottom portion of the safe, and between $4,000 to $5,000 was taken from the top portion.

[5]  An employee testified that "high-end" inventory—items with a retail value ranging from $200 to $1200—would be placed in the locked inventory room overnight.

prop the door open. Cleaning staff did not leave this type of mess. Police collected some of the rags and impounded them into evidence.[6]

Employees observed that the locks on a vacant adjacent business had been cut; they discovered some discarded packaging and phones that appeared to be packaged with a tracking device.

Juana K., an employee of the retail complex's cleaning service, testified that, around 6:00 a.m., she saw a man behind the T-Mobile store with a circular saw in his hand. She asked the man if he was working so early in the morning, and he responded he was just "walking around." She did not get a good look at the man's face because she was focused on the saw. Later that day she identified the man in a photo lineup as Jorge Cuadra.

The T-Mobile store manager testified that when he awoke the morning of July 2, he noticed he had missed a call from the store's security company shortly after 4:00 a.m. He received a call from the employee who was scheduled to open the store around 9:00 a.m., advising him of the situation. He instructed the employee not to touch anything, not to allow customers in, to call the police, and to remain outside until the police arrived. Later in the day, he contacted a member of T-Mobile's internal loss prevention department who instructed him to enter the store to perform an inventory. He and two employees wore gloves and only touched the phones and store inventory to obtain an accounting of what was taken. He did not touch the

---

[6]     A San Diego police officer estimated he observed 30 to 40 white rags in the back area of the T-Mobile store. He collected about 15 for evidence, wearing a "fresh" pair of disposable gloves, and placed them in a single paper collection bag. He testified it was routine practice to bag items together where, as here, the items were similar, were found in the same location, and were not wet. Similarly, the criminalist who performed forensic DNA testing on two of the rags testified that these types of items were "routinely packaged together."

4

rags he saw in the back of the store. He testified that the control hub of the store's alarm system had been physically removed, and the cables for the alarm and camera systems and the DVR had all been unplugged. As a result, there was no available security surveillance video of the burglary.

The value of the physical damage to the store exceeded $11,000.

The following day, Detective Michael Fish from the San Diego Police Department inspected the damage to the T-Mobile store and the vacant building next door. He observed damage to the exterior door of a storage area adjacent to the T-Mobile store. Inside the storage area, a hole was cut in the drywall that was large enough for a person to gain access to the rear area of the T-Mobile store. There was also a hole through which the suspects cut the camera and alarm systems, disabling the store's security. The detective determined that the suspects likely entered through the back door of the vacant building, cut a hole through the storage room drywall, climbed into the T-Mobile store and cut the wires to the camera and alarm systems, and then cut another hole into the back room to access the safes.

A T-Mobile asset protection manager provided the detective with a list of the phones that were stolen during the burglary.[7] She informed him that a similar incident had occurred at a T-Mobile store in Fountain Valley on May 13, 2018.[8] The detective learned that Lizeth Cuadra had been arrested in connection with that burglary. At the time of her arrest, the tracker phone

---

[7] The asset protection manager determined that $49,786 worth of inventory was stolen.

[8] The asset protection manager testified that the incidents were similar in that the perpetrators "accessed the inventory room through an adjacent wall. They went and cut into the inventory safe in the same manner and took all of the devices."

from the Fountain Valley store, stolen cell phones, and burglary tools were located inside her vehicle. The detective learned that Lizeth Cuadra was related to Jorge Cuadra, who matched the appearance, height, weight, and age of the man Juana K. had described seeing the morning of the burglary. The detective arranged a photo lineup, and Juana identified Jorge Cuadra as the individual she had seen. Juana told the detective, "I'm pretty sure that's him," and when he asked how certain she was, she responded, "75 percent."

The detective requested that the rags previously collected from the San Diego T-Mobile store be tested for DNA. A criminalist with the San Diego Police Department crime laboratory testified she performed forensic DNA testing on two of the collected rags. She observed that the rags were "clearly soiled" and appeared to have been "used in some fashion." One had "a black smudged area." She collected swabs from the rags and submitted them for comparison to DNA samples in the Combined DNA Index System (CODIS), a national database of DNA profiles maintained by the Department of Justice. After learning that the sample matched Mixon's DNA, she verified the match by comparing the DNA obtained from the rags to a known sample obtained from Mixon. On one of the rags, the criminalist observed four contributors and determined that Mixon was associated as the 77 percent contributor on one side of the rag.[9] On the other side, the criminalist also observed four contributors and determined that Mixon was associated as the 78 percent contributor. On the second rag, the criminalist observed five contributors on one side of the rag and determined Mixon was associated as the 65 percent

---

[9]     The criminalist testified it was 6.86 times 10 to the 23 times more likely to obtain the DNA results if Mixon is included than if he is not included, and pointed out that that number, which was in the sextillions, was larger than Earth's population.

6

contributor; results on the opposite side of the second rag were inconclusive.[10]

In April 2019, Detective Fish was notified regarding a CODIS database DNA match identifying Mixon as a contributor of DNA on the rags that were collected from the crime scene. Based on the DNA test results and Juana's identification, the detective concluded that more than one person was involved in the burglary. The detective learned that one address "associated with" Mixon during the period from April 2018 until April 2019 was a residence in an apartment complex located one mile east of the T-Mobile store.

The detective obtained search warrants to retrieve Mixon's cell phone records as well as information relating to the cell tower sites the phone was connecting with around the time of the burglary. A criminal intelligence analyst from the San Diego County District Attorney's Office testified that Mixon's cell phone records indicated that the top cell site activations for the period of time from the morning of July 1 to the evening of July 2, 2018, were in San Diego County, in a location very close to the T-Mobile store. However, for the period of time between 3:28 p.m. on July 1 until 3:29 p.m. on July 2, there was an activity gap on the cell phone during which no location information and no cell site activity was discernible. The analyst testified such a gap could be caused by the phone being turned off or by it being in an area outside of service range.

---

[10]    The criminalist acknowledged it is possible for DNA to survive on fabric even after "going through a washing machine," and for it to transfer from item to item. She further acknowledged there was no way for her to determine when the DNA was deposited.

### b. *GameStop Incident in Escondido in 2012*

An Escondido police officer testified that, on June 11, 2012, at around 4:25 a.m., he was dispatched to a GameStop store in response to a call reporting that two males were seen removing items from the store into a van. Upon arriving at the scene, the officer found Mixon and another man inside a minivan, along with black trash bags filled with items that had been packed up and removed from the store. He also found a screwdriver and a multi-tool kit that could be used as burglary tools, along with gloves, two-way radios, a drywall saw, a drill, bolt cutters, and a cordless Sawzall. The van's GPS system showed searches for various GameStop locations as well as entries for T-Mobile stores. Inside the van, officers recovered insurance documents, and a copy of a Costco card, for Jorge Cuadra. Mixon had a white dust mask that could be used for cutting drywall in his pocket; the mask appeared dirty, as though it had been recently used. The other passenger in the van had an S3 hand key—a tool to open and remove anti-theft devices—in his front pocket. The locking cylinders on the front door of the GameStop and the vacant building next door had been drilled out. In the common wall between the vacant building and the GameStop, holes—including one large enough for a person to fit through—had been cut into the drywall. Officers observed more black trash bags filled with store inventory inside the GameStop. The security and phone lines had been cut. In the back room, ceiling tiles had been removed to gain overhead access to a secured area.

### c. *T-Mobile Incident in Moreno Valley in 2013*

A Riverside County sheriff's deputy testified that, on December 11, 2013, at around 5:00 a.m., he was dispatched to a T-Mobile store in Moreno Valley for a burglary in progress. He was advised that a hole had been cut into the T-Mobile store from an adjacent vacant business. When searching

the vacant building next door, the deputy noticed that a ceiling panel had been disturbed and found Mixon hiding in the attic space. The deputy observed Mixon reaching to a hole that was cut in the wall. After Mixon was detained, a detective arrived to investigate the scene. The detective recovered rubber gloves, duct tape, heavy plastic bags, a long pole, white coveralls, and black spray paint from the attic space of the vacant building where Mixon had been hiding. The detective testified it was clear the suspects had gained access to the attic in the vacant building and dropped down into the T-Mobile building. In the rear of the T-Mobile store, the detective observed holes in the wall material between the T-Mobile store and the adjacent, vacant building, including one hole large enough for a person to fit through "easily." The cell phone inventory was enclosed within a chain link storage cage which had been cut with bolt cutters. The store's security cameras had been spray painted black, which made the security images difficult to see, but the detective could make out two suspects inside the storage cage removing cell phones. Inside the store he saw large, black trash bags filled with cell phones, iPads, and other inventory, valued around $78,000. He also found tools, including a sledgehammer, a foot-long "punch," and bolt cutters.

#### d. *T-Mobile Incident in Fullerton in March 2018*

On March 5, 2018, at approximately 7:04 a.m., police officers were dispatched to a T-Mobile store in Fullerton in response to a call that a stolen phone was being tracked on a nearby freeway. An officer testified that, upon arriving at the T-Mobile store, he did not notice any damage in the front of the store, but the rear door was unlocked, and cardboard was taped to the locking mechanism to keep it from locking. The store's back room was "ransacked" and coated with "powder" resembling sawdust or drywall dust.

9

The sides of the safes had been cut open with "some sort of electric saw" and emptied. Wires from the store's video security system were dangling from holes in the ceiling in the rear of the building. The security cameras and DVR system had been removed from the scene. Wires were also hanging from holes in the ceiling of the store's rear restroom, and there was a footprint on top of the soap dispenser "indicative of someone . . . hoisting themselves up to the hole in the wall or letting themselves down to the floor of the bathroom." The officer climbed up and observed that the hole in the restroom ceiling led to attic space shared with a vacant building next door. The officer observed pry marks on the rear door of the vacant business next door. The windows had been painted white to obscure the view from outside. Inside, it appeared the suspect had used the vacant business to access the shared attic space and entered the T-Mobile store through the hole in the restroom ceiling. Eighty to 100 phones had been stolen. The officer estimated it would have taken multiple trips to remove this amount of inventory. The officer suspected the perpetrator had taped the lock on the rear door of the T-Mobile store to enable easy access in and out to remove the inventory. The burglars took merchandise and currency valued at approximately $74,000.

A detective from the Fullerton Police Department testified that an alarm on a tracker phone from the T-Mobile store had been activated. The stolen tracker phone was tracked to a vehicle that parked near a residence in Long Beach. The vehicle—still containing the tracker phone—later moved from this location and was detained around 11:50 a.m. after a police pursuit. Mixon was the driver and sole occupant in the vehicle. A chisel, a small sledgehammer, a screwdriver, saw blades, rope, and a laptop were found in

the vehicle.[11]  Multiple black trash bags containing new and unopened cell phones—including the tracker phone—were discovered in the vehicle's cargo area; it was determined they were the phones taken from the T-Mobile store. A receipt from a restaurant in Fullerton just blocks from the T-Mobile store was also recovered from the vehicle.  Police later obtained surveillance footage and observed Mixon enter the Fullerton restaurant, exiting from the same vehicle he was driving when pulled over after the police pursuit.

Police executed a search of the residence at which the vehicle had previously parked.  They recovered a set of speakers stolen from T-Mobile, as well as a circular saw and extra blades.  The residence belonged to Stacy C., who, as discussed further *post*, testified as a defense witness.

e. *T-Mobile Incident in Fountain Valley in May 2018*

On May 13, 2018, at approximately 1:12 a.m., officers were dispatched to investigate a possible burglary at a T-Mobile store in Fountain Valley.  A cell phone tracker had been activated.  In the back of the store, officers noticed a large safe, which had been cut through on the side.  Employees informed the officers the safe had been filled with cell phones valued over $600 each.  A cart had been moved in front of the safe.  An officer noticed red-tinged "particles" inside the safe and on the cart and collected DNA samples. He later learned a red saw had been recovered from a suspect vehicle and observed that the saw was the same color as the particles.  The wires to the security cameras had been cut.  The drywall next to the safe had also been cut; the drywall holes led to a storage closet next door.  It appeared to an investigating officer that the perpetrator gained entry to the T-Mobile store

---

[11]  One saw blade was seven and a quarter inches in diameter and could be used to cut metal.

through the storage closet and cut holes through the drywall to cut the camera wire and gain access to the safe.

A Fountain Valley police officer testified he became aware a tracker phone had been activated during the burglary. He detained a vehicle driven by Lizeth Cuadra—Jorge Cuadra's family member. Inside the vehicle were trash bags filled with 129 cell phones, a Sawzall, a circular saw, a mask, goggles, and a headlamp. The officer testified that the Sawzall, fitted with the right blade, could cut through metal. The officer impounded the items and requested DNA testing on the mask, goggles, and headlamp. A forensic scientist from the Orange County crime laboratory testified that Mixon was included as a potential major contributor to the DNA samples obtained from the mask, goggles, and headlamp.[12]

### 2. *Defense Witnesses*

Harvey T. testified that Mixon came to his home in Los Angeles at 5:00 a.m. on July 2, 2018 to deliver a package containing cash and a birth certificate belonging to Harvey's friend. He had never previously met or even spoken to Mixon. Harvey could not explain why Mixon did not drop the items off at Harvey's friend's home instead of Harvey's. The first time Harvey provided a statement regarding these events was during trial.

Stacy C. testified that Mixon is her niece's father and she has known him for approximately 32 years. He routinely stopped by her house and helped out, doing "handyman type of work." On July 2, 2018, when Stacy attempted to leave for work between seven and eight in the morning, Stacy

---

[12]   The forensic scientist testified that, assuming there was only one major contributor to the goggle and headlamp samples, the probability of choosing an individual at random who could be that contributor is rarer than one in one trillion unrelated individuals.

noticed Mixon's car was parked behind hers. She found him sleeping in her house and asked him to move the car. On cross-examination, Stacy admitted that police had executed a search warrant at her home on March 5, 2018 and asked her questions about Mixon. She acknowledged that police found a circular saw box and the police "claimed" to have found a bag containing the saw, saw blades, and an extension cord in her garage; however, she said she did not know anything about those items. When the police asked about some additional items that they saw during the search—a large amount of rolled coins and cans of paint—Stacy informed the officers they would need to obtain another search warrant. When the police returned with an additional search warrant, the rolled coins were gone and Stacy said there were no paint cans in her garage. The first time Stacy provided a statement regarding these events was during trial.

Tiashira G. testified that her "good friend[]" Mixon had helped her fix up her home, which was the residence in the apartment complex located one mile from the T-Mobile store.[13] Mixon was at her home in San Diego on July 1, 2018 until around 4:00 p.m. helping her clear out her garage. The next day, she found his cell phone, which he had apparently left at her house the day before. The phone was off; she "assumed it was dead." The first time Tiashira provided a statement regarding these events was during trial. Even then, when providing her statement in advance of trial to Mixon's attorney, Tiashira did not mention anything about finding Mixon's phone at her home. Tiashira testified four days after the prosecution witness who analyzed Mixon's phone records and testified about a gap in the records.

---

[13]    Tiashira testified that Mixon did not live with her but sometimes he would stay at her house. They were also in a prior dating relationship.

Thomas W. testified he is a tow truck operator in Los Angeles covering all of Southern California.  He testified that he provided services to Mixon by jump-starting a vehicle around 4:45 a.m. on July 2, 2018 in the city of Inglewood.  Thomas provided a handwritten receipt indicating the date and time of the service.  Thomas had no other records for towing services provided before or after Mixon's.  The first time Thomas provided a statement regarding these events was during trial (a day before he testified).

### 3. *Closing Arguments*

The prosecution described the incidents as "hole-in-the-wall" burglaries and emphasized the striking similarities between them, arguing that Mixon was "the common denominator" in all the crimes.  Mixon argued his witnesses established he was in Los Angeles on the day of the crime, and there was no way to know how long Mixon's DNA had been on the rags or who brought them inside the store.  Mixon's counsel asked the jury, "Who brought the rag with the DNA inside the store?  We don't know.  I have a suspicion that Jorge Cuadra did.  He worked with [Mixon] in the past, not all the time, sometimes.  And in their little basket of tricks, brought that in with them.  That's how the rag got there."

In rebuttal, the prosecution noted there was no evidence that Cuadra and Mixon worked together in the past, at least not in connection with anything lawful.  The prosecution further argued with respect to the

14

purported alibi witnesses that "the timing of them coming forward alone makes all of that testimony highly, highly suspect."[14]

### 4. *Jury Instructions*

The jury was instructed with CALCRIM No. 223 that "[f]acts may be proved by direct or circumstantial evidence or by a combination of both."  The jury was further informed, "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other.  Neither is entitled to any greater weight than the other.  You must decide whether a fact in issue has been proved based on all the evidence."

The jury was further instructed with CALCRIM No. 375 regarding evidence of uncharged offenses to prove identity, intent, and common plan, as follows:

> "The People presented evidence that the defendant committed other offenses of burglary, grand theft, vandalism, and possession of burglary tools that were not charged in this case.  [¶] . . . [¶]
>
> "If you decide [by a preponderance of the evidence] that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:  . . . [t]he defendant was the

---

14    The prosecutor referred to a jury instruction which the court provided regarding the late disclosure of evidence.  The instruction provided as follows:  "Both the People and the defense must disclose their evidence to the other side at least 30 days before trial.  Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.  [¶]  If material and information becomes known within 30 days of trial, disclosure shall be made immediately.  [¶]  In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

15

person who committed the offenses alleged in this case; or . . . [t]he defendant acted with the intent to commit theft in this case; or . . . [t]he defendant knew how to disarm a security system and cut holes into walls and safes when he allegedly acted in this case; or [¶] . . . [¶] [t]he defendant had a plan or scheme to commit the offenses alleged in this case; or . . . [t]he defendant has committed similar offenses in the past with others, namely Jorge Cuadra."

The jury was instructed on the elements of the charged offenses and was also instructed on principles of aiding and abetting, including the instruction that "[a] person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.)

5. *Verdict*

The jury returned guilty verdicts on all three charges and found true the allegation that the vandalism damage exceeded $10,000. The trial court sentenced Mixon to the upper term of three years on count 1 and imposed but stayed terms on the remaining counts pursuant to section 654.[15]

DISCUSSION

Mixon acknowledges he "has a history of being connected" to similar burglaries but claims "there was no substantial evidence" he was involved in

---

[15] Mixon requested that this court take judicial notice of an order filed after judgment was rendered against him, recalling the warrant and dismissing the case previously filed against his codefendant Jorge Cuadra, stating that, "[i]n April/May 2020, the People received information that raised a reasonable doubt as to [Cuadra's] guilt." Because the document is outside the appellate record and more appropriately considered by a petition for writ of habeas corpus, we deny Mixon's request for judicial notice. (See § 1473, subd. (b)(3)(A) [providing that a writ of habeas corpus may be granted when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial"].) We take no position on the merits of any such claim.

this one.  He challenges the DNA evidence in particular, contending it was insufficient to prove he was present during the commission of the crimes.  We disagree with Mixon's contentions and conclude there was sufficient evidence to support the jury's verdict.

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)  We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)  Reversal for insufficient evidence is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

Mixon was convicted of grand theft (§ 487, subd. (a)), burglary (§ 459), and vandalism (§ 594, subds. (a), (b)(1)).  " ' "The crime of grand theft is complete when a man takes property not his own with the intent to take it, and a defendant may be convicted of grand theft upon proof of facts establishing (a) embezzlement, (b) larceny or (c) obtaining property under

17

false pretenses. . . ." ' ' " (*People v. Hussain* (2014) 231 Cal.App.4th 261, 272, fn. 5; §§ 487, 484.)  Theft by larceny is committed when a person:  "(1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away."  (*People v. Davis* (1998) 19 Cal.4th 301, 305.)  Burglary requires proof that the defendant entered a building with intent to commit larceny.  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 670; § 459.)  "[T]he slightest entry by any part of the body or an instrument is sufficient[.]" (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 273.)  A defendant commits vandalism if he maliciously defaces, damages, or destroys any real or personal property not his own.  (*People v. Moore* (2018) 19 Cal.App.5th 889, 894; § 594, subd. (a).)

Mixon emphasizes that little or no direct evidence connects him to this crime.  It is true that the prosecution relied on circumstantial evidence.  "But ' "[t]he standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]  ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " ' "  (*People v. Jones* (2013) 57 Cal.4th 899, 960-961 (*Jones*).)

18

Here, the evidence established that one or more suspects entered through the vacant adjacent building, used power tools to enter the T-Mobile store, disabled the security systems, cut through safes and walls to obtain access to cash and secured inventory, absconded with products valued at nearly $50,000, and caused property damage in excess of $10,000. This evidence establishes all the elements of grand theft (§ 487, subd. (a)), burglary (§ 459), and vandalism (§ 594, subds. (a), (b)(1)).

Mixon disputes there was sufficient evidence to prove that *he* was the perpetrator of these crimes. He focuses largely on the DNA evidence, contending his DNA could have been deposited onto the rags at any time, and the DNA evidence therefore does not show Mixon was involved in the instant offense. Although Mixon's counsel *argued* during closing that someone else could have brought the rags inside the store—without Mixon being involved in the crimes—there was no actual evidence to support his claims. The evidence established the rags were not in the store before the burglary and were instead brought in during the crime. They were located in the back room (rather than the sales floor accessible to the public), near the cut out hole in the wall used to gain access to the store during the burglary. Cleaning staff did not leave this type of mess and the rags were not used by T-Mobile employees. Mixon was not a *minor* contributor to the DNA found on the two tested towels; he was the *main* contributor, contributing 77 and 78 percent on one rag and 65 percent on the second rag. These circumstances " ' "reasonably justify" ' " the jury's determination that the DNA evidence on the towels was deposited by Mixon when *he* used them *during the crimes*. (*Jones*, *supra*, 57 Cal.4th at p. 961.) Because " ' "the circumstances reasonably justify the [jury's] findings," ' " the possibility " ' "that the circumstances might also reasonably be reconciled with a contrary finding

does not warrant a reversal of the judgment." ' " (*Ibid*.)  Construed in the light most favorable to the judgment, the evidence establishes that Mixon's DNA was found on towels the perpetrator (or perpetrators) brought to the crime scene and used while cutting through walls, wires, and safes to gain access to the store's cash and high-end inventory and disabling the security systems.  The DNA evidence provides substantial evidence to support the verdict.  (See *People v. Turner* (2020) 10 Cal.5th 786, 810 [statistical evidence regarding probability that DNA matches defendant provides substantial evidence in support of guilty verdicts].)

Mixon claims this case "is essentially a DNA-only case," and he analogizes this case to a line of so-called "fingerprint-only" cases.  (See, e.g., *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 937-938; *People v. Jenkins* (1979) 91 Cal.App.3d 579, 584; *People v. Johnson* (1984) 158 Cal.App.3d 850, 854-856; *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, 357-359 (*Mikes*).)  None of these cases involved DNA evidence and they are distinguishable in other important respects.  In *Birt*, the court held that the mere presence of a *female* defendant's fingerprint on a cigarette lighter found in a rental vehicle used by *two male suspects* in a burglary was insufficient to uphold the female defendant's burglary charge.  (*Birt*, at pp. 937-938.)  The court noted that the van where the defendant's fingerprint was located was "a rental vehicle available to the public," and her fingerprints were not found inside the actual burglarized premises.  (*Id*. at p. 938.)  Similarly, the defendant's fingerprint in *Mikes* was located on a murder weapon (a post from a store turnstile) that

20

was readily accessible to the public. (*Mikes*, at pp. 356, 358-359.)[16] *Jenkins* and *Johnson* both involved convictions for the possession of PCP for sale. (*Jenkins*, at p. 583; *Johnson*, at p. 852.) In each case, the defendant's fingerprints were at a location where the defendant had an innocent explanation for being present. (See *Jenkins*, at pp. 582-583 [fingerprints were obtained inside a garage at defendant's brother's residence]; *Johnson*, at pp. 853-854 [a single thumbprint on a bottle containing an illicit substance was insufficient to show defendant had dominion and control over the drugs where he was only one of nine persons present in the house].) Here, by contrast, the rags were located at a time when the store had been closed, in the immediate vicinity of a hole that had been cut in the wall to gain access. There was no evidence that Mixon had an opportunity to leave his DNA at the T-Mobile store without necessarily committing the charged crimes. Nothing but far-fetched conjecture suggests Mixon's DNA was brought in to the store at the exact time of the crime by someone else, while Mixon remained uninvolved. (See *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 909-910 [rejecting defendant's claim that fingerprint evidence was insufficient and declining "to extend *Mikes* to cover fingerprints that are found in places or on objects that were never accessible to the general public and that can be

_____

16    The court held that this evidence was not sufficient alone to support a conviction absent any evidence the fingerprint was placed on the turnstile at the time of the crime. (*Mikes*, *supra*, 947 F.2d at pp. 357, 361.) In *People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1587, the Court of Appeal noted that decisions of intermediate federal appellate courts are not binding on California courts, and that *Mikes* is inconsistent with the California Supreme Court's holding in *People v. Gardner* (1969) 71 Cal.2d 843, 849 that fingerprint evidence "is ordinarily sufficient alone to identify [a] defendant." Regardless, we conclude *Mikes* is distinguishable here.

explained in a manner consistent with innocence only through far-fetched, unsupported speculation"].)

More fundamentally, even assuming these fingerprint-only cases can be extended to situations involving DNA evidence, this case is not a "DNA-only" case. In addition to the DNA evidence, Mixon's cell phone records established his phone was being used in San Diego County in an area very close to the T-Mobile store both before and after the burglary. An activity gap in his cell phone records indicated his phone was turned off or otherwise out of service during the time the burglary was committed. There were competing theories explaining this gap in the records. The prosecution argued Mixon was a sophisticated criminal who learned to "evolve and adapt" from his prior offenses. Similar to using a two-way radio (or walkie-talkie) to communicate, as the prosecution posited he did in 2012, Mixon was "smart enough to know to not have his cell phone on while he's actually committing the crime." By contrast, the defense argued Mixon was in Los Angeles, and he had left his phone behind with Tiashira in San Diego and it was off or "dead." The jury could reasonably reject the defense theory, question the credibility of the defense witnesses, and agree with the prosecution that Mixon deliberately turned his phone off to avoid detection. As a reviewing court, we are prohibited from reweighing the evidence presented in the trial court, and we are required to resolve all conflicting evidence in favor of the judgment. (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

The prosecution also presented evidence of Mixon's prior involvement in similar, specialized burglaries, supporting rational inferences of identity,

common design, and intent.[17] " ' "[O]ther crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' " (*People v. Erskine* (2019) 7 Cal.5th 279, 295.) The evidence here established that, in 2012, Mixon was caught during the burglary of a GameStop store, in a van filled with stolen inventory, burglary tools, a GPS device showing searches for T-Mobile stores, two-way radios, and a dirty mask for cutting drywall in his pocket. In 2013, Mixon again was caught during a burglary of a T-Mobile store, this time hiding in the attic space with burglary tools. In March 2018, a tracker phone stolen from a T-Mobile store led police to Mixon, who was driving alone in a vehicle with bags of stolen electronics (including the tracker phone) and burglary tools. In May 2018, the stolen inventory from a T-Mobile store was located in a vehicle which also contained burglary tools, as well as a mask, goggles, and a headlamp with Mixon's DNA on them.

Mixon argues "nothing about the manner [in which] the burglary was committed leads to an inference that Mixon must have been involved" here because "these types of hole-in-the-wall burglaries are not particularly unique." We disagree. These were not generic incidents involving a suspect who simply enters through a vacant, adjacent building. They were not "impulsive smash-and-grab burglaries" either as the prosecution emphasized during closing argument. These burglaries were committed using unique tactics, skills, and knowledge, and were committed in a very specialized

---

17     The evidence also connected Mixon with codefendant Jorge Cuadra, who was identified by an eye witness at the scene of the crime. Mixon does not challenge the admission of the evidence regarding the other crimes.

manner.  They were well thought out, planned, and coordinated.  In all instances, access to a retail electronics store was gained through a vacant building next door, using circular saws and other power tools to cut holes through the walls.  The store's alarm systems were disabled to prevent proper operation of security cameras; tools were used again to access secured spaces; and high-end electronics were stolen.  The high degree of similarity between these specialized crimes is evidence from which the jury can infer Mixon's identity as the perpetrator of the instant offense.

In sum, the prosecution presented ample circumstantial evidence, including DNA test results, cell phone records, and prior crimes evidence, that supports the jury's conclusion that Mixon was guilty of the charged offenses.  Reviewing the record in the light most favorable to the judgment, we conclude substantial evidence supports Mixon's convictions.  (*Cravens*, *supra*, 53 Cal.4th at p. 507.)

## DISPOSITION

The judgment is affirmed.

GUERRERO, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

24